David D. BECK, a/k/a Dave Beck, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16424.

United States Court of Appeals Ninth Circuit.

Jan. 20, 1962.

As Modified Feb. 14, 1962.

Charles S. Burdell, William L. Dwyer, Seattle, Wash., for appellant.

Charles K. Rice, Asst. Atty. Gen., Meyer Rothwacks, Kinsey T. James, John J. McGarvey and Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., John S. Obenour, Asst., Tacoma, Wash., for appellee.

Before BARNES, MERRILL and KOELSCH, Circuit Judges.

BARNES, Circuit Judge.

The taxability of embezzled funds has been the subject of legal dispute for several years. This court in 1945, under certain limited facts,[1] held that when an embezzler takes money from an employer with no conceivable claim or colorable claim of right to it, it at no time becomes a taxable "gain" or "profit" or "income" to the embezzler, within the definition of "gross income" as defined in Section 22 of the Internal Revenue Code of 1939 (26 U.S.C. § 22). Wilcox v. Commissioner, 9 Cir. 1945, 148 F.2d 933. This court agreed with the fifth circuit opinion of McKnight v. Commissioner, 1942, 127 F.2d 572, which in turn relied on language used in North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197. Our opinion distinguished the holding in Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

This court's decision was upheld in Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, wherein the Supreme Court ruled:

"[A] taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. * * *";

that " * * * the bare receipt of property or money wholly belonging to another lacks the essential characteristics of a gain or profit * * *" (327 U.S. at 408, 66 S.Ct. at 549) unless there exists a *use* of the embezzled moneys, or a *cancellation* of the indebtedness (created by law) for an amount equal to the embezzled funds.

The Supreme Court again had the matter before it in the recently decided case of James v. United States, 1961, 366 U.S. 213, at 215, 81 S.Ct. 1052, at 1053, 6 L. Ed.2d 246:

"Six years later, this Court held, in Rutkin v. United States [1945] 343 U.S. 130 [72 S.Ct. 571, 96 L.Ed. 833], that extorted money [in 1943] does constitute taxable income to the extortionist in the year that the money is received under § 22(a) of the Internal Revenue Code of 1939. In Rutkin, the Court did not overrule Wilcox, but stated:

" 'We do not reach in this case the factual situation involved in Commissioner [of Internal Revenue] v. Wilcox, 327 U.S. 404 [66 S.Ct. 546, 90 L.Ed. 752]. We limit that case to its facts. There embezzled funds were held not to constitute taxable income to the embezzler under § 22(a).' Id. [343 U.S.] at page 138 [72 S.Ct. at 576].

"However, examination of the reasoning used in Rutkin leads us inescapably to the conclusion that Wilcox was thoroughly devitalized."

The Supreme Court in James then pointed out that Rutkin's claim was no greater than that of Wilcox; that both had obtained money by means of a criminal act; that neither had a bona fide claim of right to the funds; that both could be required to make restitution, i. e., "the right to recoupment exists in both situations." Thus, "the Wilcox ra-

---

1. (a) Proceeds held not as embezzler's funds but as employee's; (b) proceeds never invested (i. e., were gambled away) and which produced no income; and (c) law of Nevada permitted employer to replevin funds, once embezzled; (d) law of Nevada provided embezzler liable to employer for an amount equal to value of embezzled funds.

tionale was effectively vitiated by this Court's decision in Rutkin," as several circuit courts have previously stated.[2] "Wilcox was wrongly decided."

The court then stated:

"When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, expressed or implied, of an obligation to repay and without restriction as to their disposition, 'he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' North American Oil [Consolidated] v. Burnet, supra [286 U.S.], at p. 424 [52 S.Ct. at p. 615]. In such case, the taxpayer has 'actual command over the property taxed—the actual benefit for which the tax is paid,' Corliss v. Bowers, supra [281 U.S. 376, 50 S. Ct. 336, 74 L.Ed. 916]. This standard brings wrongful appropriations within the broad sweep of 'gross income'; it excludes loans. When a law-abiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as 'gross income' in the year received. United States v. Lewis, supra [340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560]; Healy v. Commissioner, supra [345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007]. We do not believe that Congress intended to treat a lawbreaking taxpayer differently." Id., 366 U.S. at 219–220, 81 S.Ct. at 1055.

However, in James, because a felony conviction must rest upon a *willful* failure to account, or a *willful* attempt to evade taxes (Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418), and *specific intent* must be proved by independent evidence and cannot be inferred from the mere understatement of income (Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150), a divided Supreme Court ruled that the "gloss put upon [the statute] by Wilcox" prevented a conviction for "failing to include embezzled funds in gross income in the year of misappropriation," while Wilcox was the law of the land.

With this clarification of the law on the taxability of embezzled funds before us (which did not exist at the time of trial below), we turn to the facts of the instant case.

Appellant Dave Beck was indicted in May 1957 on two counts, one under 26 U.S.C. § 145(b),[3] the other under 26 U.S.C. § 3793(b) (1).[4] In August he was

2. See note 6, James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246.

3. 26 U.S.C. 1952 ed., Sec. 145(b) reads as follows:

"§ 145. Penalties
* * * * * *
"(b) Failure to collect and pay over tax, or attempt to defeat tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

4. 26 U.S.C. 1952 ed., Sec. 3793(b) (1) reads as follows:

"§ 3793. Penalties And Forfeitures.
* * * * * * *
"(b) Fraudulent returns, affidavits, and claims.
"(1) Assistance in preparation or presentation. Any person who willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a false or fraudulent return, affidavit, claim, or document, shall (whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document) be guilty of a felony, and, upon conviction thereof, be

indicted by the same grand jury on three additional counts under § 145(b), on two additional counts under § 3793(b) (1), and with codefendants under 18 U.S.C. § 371 on two counts charging a conspiracy to evade payment of his taxes. The seven counts which named Beck alone were segregated for trial. The trial began on November 10, 1958. At that time the government dismissed one of the counts against appellant. In February 1959 a jury returned verdicts of guilty as to the remaining six counts. Appellant was sentenced to five years imprisonment, and required to pay costs amounting to about $11,000 and various fines totaling $60,000. This court has jurisdiction on appeal. 28 U.S.C. § 1291. Appellant was sentenced to five years imprisonment on each of the six counts on which he was convicted, the sentences to run concurrently. He was also sentenced to pay fines of $10,000 on each count, or a total of $60,000, and to pay costs amounting to about $11,000.00.

If the sentences were wholly concurrent, one count free from error would sustain the conviction; that is, we would look no further. See, for example: Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173; Russell v. United States, 9 Cir. 1961, 288 F.2d 520, at 522 (and cases there cited); Hattem v. United States, 9 Cir. 1960, 283 F.2d 339, 341; Green v. United States, 9 Cir. 1960, 282 F.2d 388, 392; King v. United States, 9 Cir. 1960, 279 F.2d 342, 344.

Hereinafter, we uphold the convictions on two counts, but examination of all counts here became necessary because of the separate fine assessed on each count. As will appear, we find reversal on four counts necessary. The judgment for costs will stand.

fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

## FACTS

During the period from 1950 to 1953 appellant misappropriated to his own personal use some $365,000 of the funds of the various union entities with which he was associated. This amazing series of embezzlements is detailed in the appellee's brief (pages 31–86). It would serve no useful purpose to repeat the details here. Beck and certain of his close associates had the power to sign checks on the accounts of certain union entities. Checks on these various accounts were used to pay Beck's personal bills, to purchase property in his name, or to pay sums to third persons who used the money to Beck's advantage.

There was further proof (the materiality of which hereinafter becomes evident) of instances in which Beck received expenses for various travels from two sources, either being reimbursed by two labor organizations for the same trip, or being reimbursed once and charging the trip on credit cards payable at a later time by the union. Travel expenses totaling $35,000 were claimed and paid to Beck but were not used by him to pay the costs of travel on the union's behalf.

During the period that the grand jury met to indict Beck on this charge, there was considerable adverse publicity in the communications media concerning his refusal to testify before a congressional committee as to certain matters. Beck has been convicted of embezzlement in the state court of Washington on a charge of dealing with a very small portion of the funds which form the basis of this case.

On this appeal Beck asserts some twenty-five specified errors which may be summarized as follows: [5]

1. That appellant was deprived of an unbiased grand jury.

2. That appellant was deprived of an unbiased petit jury.

5. Appellant summarizes these under nine "parts" of his argument. We reduce the number to eight by consolidating four and five (which are really one) as four.

3. Error was committed in the restriction of the cross-examination of government witness Hupf.

4. That the funds taken were either embezzled or borrowed, and neither source would constitute taxable income.

5. If embezzled funds did constitute taxable income, the state of the law was such that no one could knowingly willfully evade taxes thereon.

6. Failure of proof on the counts concerning the Joint Council Building Association returns. These are the so-called "900" counts—charging the aiding, assisting and filing of false union returns.

7. Error in admitting evidence of destruction of appellant's records, and in instructing the jury thereon.

8. Error in admitting evidence of appellant's refusal to cooperate with the Internal Revenue Service, and in instructing the jury thereon.

We will consider each of these eight contentions of appellant in turn, with four and five considered together.

I

Was appellant deprived of an unbiased grand jury?

At the time the grand jury returned the indictments which were the subject of this prosecution in 1957, appellant was very much in the headlines as a corrupt labor boss. Many of the newspaper headlines were introduced as exhibits below, and are reproduced in the brief. There was a high concentration of such headlines in the State of Washington where appellant lived and was indicted. From this evidence appellant urges that it is apparent that he was denied his right to an impartial grand jury. *There was no evidence that in fact the grand jury was prejudiced or that any member thereof had been affected by the vast amount of publicity accorded Beck.*

The cited cases which have reversed convictions have been based on something more than exists here. The usual case concerns the systematic exclusion of some certain class or classes of citizens, from which it can be strongly inferred that prejudice has resulted. The civil rights protected in these cases are bigger than the rights protecting any criminal or criminal class from the unfavorable publicity resulting from their own corrupt or illegal acts.[6] We rule that a specific showing of prejudice is necessary to make erroneous the action of the trial judge in refusing to dismiss the indictment. The court here so ruled following an *in camera* examination of the minutes of the grand jury. We find no error.

6. From appellant's brief we quote, after a reference to the Washington law defining embezzlement:

"It was under this statute that appellant was convicted in 1957 of embezzling $1900 from the Western Conference of Teamsters.

"The evidence in the present case shows beyond dispute that appellant in his capacity as officer and employee, was in custody and control of the finances of the union organizations involved, and that he withheld and appropriated the same to his own use (whether as a loan or otherwise) without the knowledge of the governing boards of officers of the organizations. He 'directed and controlled' the operations of the unions (Tr. 6099) and was 'in possession' of their funds (Tr. 4825). He was signator to their bank accounts and unilaterally issued checks drawn thereon. He did not render accountings or financial statements to the unions, the handling of financial matters was left largely to him, and he was not required to give reasons or make representations as to the purposes for which he was dispensing union funds (Tr. 4353, 4359, 4363, 4366, 4374–4376, 4380, 4409–4410, 4440, 4444–4450, 4458, 4895, 4898, 4970, 5103–5104, 5109, 6006, 6022–6029).

"There was no evidence to support a conclusion that appellant obtained the funds by false pretenses or any comparable means. If not loans, the acquisitions were purely the proceeds of embezzlement, as that term has been defined both historically and by modern statute." (Brief of Appellant, pp. 69–70.)

## II

### Was appellant deprived of an unbiased petit jury?

█ The trial judge refused a final motion to continue the trial or change venue. It is asserted this was error and caused appellant to be tried before a prejudiced petit jury. Prior to the final denial the following continuances of the appellant's trial had been granted by the trial court:

(a) October 28, 1957: for a period of six months

(b) January 21, 1958: for a period of six weeks

(c) April 1958: indefinitely

The trial commenced on November 10, 1958, over a year and six months after the indictments had been found. (May 1957).

The appellant points to all the newspaper publicity existing before the public during the period previous to his trial, as evidence as a matter of law that it would have been impossible to find a panel of jurors which did not have information about the case obtained outside the courtroom. He relies largely on Delaney v. United States, 1 Cir. 1952, 199 F.2d 107, to prove this error.

In Delaney the government activities which created the prejudice complained of were much more contemporaneous with the trial than is the case here. The first motion made by defendant Delaney for a continuance of his trial, denied in the district court and found error by Judge Magruder, was made on November 15, 1951, *two months* after the original indictment (found September 14, 1951). His second motion, made November 29, 1951, was granted and a one-month continuance was given Delaney. His third motion, made January 3, 1952, (three and a half months after the original indictment) was denied. The court in Delaney recognizes that "the prejudicial effect of * * * publicity" cannot "be said * * as a matter of law" to be "so permanent, and ineradicable by mere lapse of time"

that a fair trial "at any time within the foreseeable future" was impossible. (199 F.2d at 112.)

Here the indictments were all over fifteen months old, congressional hearings had not concerned Beck for more than a year, and his embezzlement conviction in state court was over ten months old. There was some continuing publicity about Beck, but it seems obvious that it would be impossible ever to bring this defendant to trial if it were necessary to await a complete abatement of all publicity concerning a man so much in public view.

A careful review of the record as to voir dire testimony of the empaneled jurors is required of this court. Irvin v. Dowd, 1960, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751. We believe the judge conducted the voir dire in an able and admirable fashion, particularly in view of the difficulties under which he labored.

█ While the juror must be "indifferent as he stands unsworne," it is

" * * * not required however that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. [People of State of] Illinois, 123 U.S. 131 [8 S. Ct. 21, 31 L.Ed. 80]; Holt v. United States [218 U.S. 245, 31 S.Ct. 2, 54

L.Ed. 1021; Reynolds v. United States], 98 U.S. 145 [25 L.Ed. 244].

" * * * As stated in Reynolds, the test is 'whether the nature and strength of the opinion formed are such as in law necessarily * * * raise the presumption of partiality. The question thus presented is one of mixed law and fact * * *.' At p. 156 of 98 U.S. 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside * * *. If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At p. 157 of 98 U.S. As was stated in Brown v. Allen, 344 U.S. 443, 507 [73 S.Ct. 397, 446, 97 L.Ed. 469], the 'so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' " (366 U.S., at 722–723, 81 S.Ct. at 1642.)

■ For us to hold that the trial judge committed error as a matter of law would mean that a judge could never determine that the effect of prejudicial publicity could ever die down to a point where it was no longer prejudicial. Cf. Stroble v. State of California, 1951, 343 U.S. 181 at 193, 72 S.Ct. 599, 96 L.Ed. 872. The result would be that no public figure could ever be tried so long as one derogatory news item concerning him appeared in the public press. This we cannot and will not hold. The area of the trial judge's discretion must be large. Lisenba v. People of State of California, 1941, 314 U.S. 219 at 228, 62 S.Ct. 280, 86 L.Ed. 166. And "the findings of the trial court upon that issue [the force of a prospective juror's opinion] ought not to be set aside by a reviewing court, unless the error is manifest." Reynolds v. United States, 1878, 98 U.S. 145, 156, 25 L.Ed. 244, quoted with approval in Irvin v. Dowd, supra.

The principal charge of prejudice existing against defendant and appellant Beck relates to Juror Hamilton. *He was excused by the trial judge.* It is true that he made a specific explanation as to why he was prejudiced against Beck—this resulted in a motion for a mistrial, which was denied. An admonition to the jury was promised by the trial court and was given.

We find no "manifest" error—no clear and convincing proof of prejudice existing in the mind of any juror finally accepted and empaneled.

### III

### Was there error in restriction of certain cross-examination?

■■ The final government witness, Hupf, testified to conclusions drawn from the evidence in the trial as a whole, and presented these conclusions in the form of a summary or balance sheet of appellant's finances, showing his increase in net worth over the indictment years. (The government used the net worth plus expenditures method of proof of income, since the taxpayer's records had been destroyed.) Hupf's cross-examination was restricted. The appellant characterizes this restriction as a refusal to allow him to test the conclusions of the witness by ascertaining the basis for them. The questions concerned the reason for the expert's failure to include the amount of admittedly embezzled funds as liabilities of appellant, when he constructed the balance sheet. The government contends that the court was merely preventing the defense from quibbling with the witness over a point of law, and further points out that the cross and voir dire-examination of the witness was generally unrestricted and voluminous, covering some two hundred pages of the record. The rulings complained of are on pages 10,463–4 and 10,466–7 of the transcript. We have examined these and find no error. The extent to which cross-examination of a witness will be allowed rests in the sound judicial discretion of the trial court. We find no abuse of that discretion. District

of Columbia v. Clawans, 1937, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843; Alford v. United States, 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; United States v. Johnson, 9 Cir., 1961, 285 F.2d 35, 40, and cases there cited.

## IV and V

The taxability of embezzled funds.

■ With this alleged error we reach the heart of appellant's case. Almost all, but not the entire sum, which was unreported as income by Beck was embezzled funds. Beck, on appeal, admits that the jury was presented the problem of determining whether the funds constituted a loan from the union to Beck (in which case they were instructed to acquit) or embezzled funds (in which case they were instructed to convict). Appellant admits that the finding of guilty meant that the jury considered those funds allegedly embezzled to have been embezzled, and income.

The James case, supra, does not change the rule that a failure to report income realized through criminal activities *other than embezzlement* (as for example, larceny by false pretenses) may be punished criminally as a willful tax evasion for failure to report income.

But, says appellant, here there was in the record evidence "from which it could be inferred that appellant had authority to lend union moneys to himself, or others." The court left that issue to the jury, and instructed the jury that proceeds from loans do not constitute taxable income. The jury verdict impliedly rejected the theory of a loan. Hence, says appellant, *the only possible alternative conclusion* is that the jury found the funds were embezzled.

The government disputes the validity of such a simple conclusion, maintaining

that the evidence discloses that (1) it could have been found by the jury to be compensation for services rendered, for Beck so treated and so considered the sums taken by him,[7] hence there could be no willful violation of a state law defining embezzlement; and (2) even if Beck intended to embezzle, as defined by Washington law, he never had lawful possession of the union funds as such, so as to permit embezzlement.

Obviously, if Beck did obtain the money as compensation for services rendered, he was required to pay taxes thereon. Therefore we reject the conclusion that the moneys received by Beck were necessarily loans, or embezzled funds, and could be nothing else. They could have been found to have been either simple compensation or funds obtained by criminal activities other than embezzlement.

But we cannot read the jury's mind. If the jury found the unreported cash to be either embezzled or obtained from other criminal activities or compensation for services rendered, the jury could have found Beck guilty. It was only if they were found to be loans that Beck would be found not guilty. (We here are temporarily not concerned with the rule of the Wilcox, supra, case, or the effect of Rutkin, supra, on that rule, or Beck's knowledge of or reliance upon those cases or any others.)

■ Entirely apart from the larger sums of money either embezzled or paid as compensation or obtained as a loan or obtained through other criminal (nonembezzling) methods, the government points to the fact that there were moneys paid as reimbursement for travel expenses which allegedly would clearly fall within the fourth class of receipts mentioned above, funds obtained through criminal but nonembezzling methods. There hav-

7. (1) The evidence discloses that Beck was paid no salary but had unlimited authority, intentionally granted by the union, to take any and all funds he desired.

(2) There was testimony Beck could have named for himself any salary he desired.

(3) There was evidence no accounting was ever required of Beck.

(4) There was in evidence the conduct of the union after Beck's indictment, including the execution of the accord and satisfaction entered into (Pl.Ex. 692) between Beck and the union.

ing been but a general verdict and no special verdicts entered below, we have no way of determining whether the double receipt of travel money was or was not relied on by the jury to convict the appellant. As appellant correctly states in his brief, "When two theories are submitted to a jury, one of which is incorrect, a general verdict of guilty must be reversed even though the jury was properly instructed upon the alternate theory." Williams v. State of North Carolina, 1942, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279; Stromberg v. People of State of California, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117.

These "expense moneys" which wound up in appellant's control are distinguishable from loans and embezzled funds. To fully understand the matter we refer to and adopt the résumé of appellant with respect thereto.[8]

8. At all times material, appellant traveled extensively and received from union entities substantial sums by way of travel and expense allowances and advances, which sums were not in fact expended by him for such purposes. As an officer of the International Union, he carried a credit card issued by that organization on which he charged transportation costs. (Tr. 7363–7364.) In addition, he was entitled to a "hotel allowance" of $15 a day when in travel status—and on occasion received considerably more, a per diem allowance of first $5 and later $7.50 a day, whether traveling or not, and, beginning in 1953, a car allowance of $150 a month. (Tr. 7308–7309, 7559.) The hotel and other allowances, plus miscellaneous expenses such as cab fares and sundry items, were claimed by appellant on monthly salary and expense statements which he submitted to the International Union. (Exhibits 778 through 778K; Tr. 7302.) In these statements appellant sometimes claimed a hotel allowance of as high as $40 a day. The monthly vouchers were prepared by his secretary, Ann Kotin, partly from information already in her possession, and partly from information given to her by appellant. His salary and expense checks from the International Union were deposited in his wife's bank account. (Tr. 6709–6720, 6732.)

In most instances, the hotel and travel allowances which appellant received from the International Union were not in fact expended by him for such purposes. For example, after appellant assumed the presidency of the International Union in late 1952, he continued to maintain his permanent residence in Seattle, with offices in both Seattle and Washington, D. C. When in Washington, he claimed and received the regular hotel allowance of $15 a day but stayed in an apartment at the Woodner, the rent for and expenses of which were paid by the International Union. (Tr. 6695–6696, 6720–6722, 7493.) On many other occasions during the indictment years when appellant's hotel bills were paid directly by the International Union, he nonetheless claimed and received the regular hotel allowance for the same travel. (The hotel bills which the International Union paid for appellant contained not only room charges but charges for such extras as meals, telephone calls, valet service, auto rental and sundries. (See, e. g., Tr. 7440.) No other staff member of the International Union was accorded such a "privilege." (Tr. 7561.) Moreover, appellant was accompanied by his wife on some of his travels and her expenses on these occasions were also paid by the International Union. (Tr. 7395–7415, 7425–7449.)

On other occasions, appellant was reimbursed for the same travel by more than one union entity. For instance, in February 1950 he attended meetings in Miami, Florida, of the executive boards of the International Union and the American Federation of Labor. His air transportation to and from Miami was charged to the International Union. In the voucher which he submitted to the International Union for this month, he claimed and received a hotel allowance of $40 a day for the 19 days he was in Miami. While in Miami, he attended a concurrent meeting of the executive board of the Union Label Trades Department of the American Federation of Labor. For attending this concurrent meeting, appellant claimed and received from the Union Label Trades Department, a fee and traveling expenses totaling $687.35. (Tr. 7184–7204, 7391–7395, 7420–7423.) In August 1950 and January 1951, he again received payments under similar circumstances in the amounts of $498.63 and $541.71, respectively, from the Union Label Trades Department. (Tr. 7198, 7284.)

On another occasion, appellant included in an expense voucher submitted to the International Union one item which he did not in fact pay, and another which was personal in character. Thus, in the voucher which he submitted to the Inter-

The receipt of such expense money in certain years may well distinguish this case from the James case. If such expense money is found by the trier of fact to have been acquired other than by embezzlement, then the James case is not controlling. Recognizing this, appellant in his supplemental brief filed after the decision in the James case, urges us to take the position that "the evidence is insufficient as a matter of law on the issue as to whether the expense moneys constitute income."

Because the government produced records of hotel bills in only eleven cities of the United States, says appellant, there is no proof he did not spend the moneys doubly paid him for services in such named cities to *other* hotels, or in *other* cities. Such expenses were heavy, says

national Union for the Month of January 1953, he claimed and received reimbursement for a "consultation expense" of $128.70, allegedly paid to Wampold. (Tr. 7323–7324.) The latter denied having received any such fee from appellant. (Tr. 6985–6986.) Included in the same voucher was an item of $125 paid by appellant to his investment counselor, Loomis.

Moreover, the International was not the only union entity which paid hotel bills and travel expenses of appellant. At appellant's direction hotel bills and restaurant checks were frequently mailed to him at a post office box address in Seattle. Upon his return to Seattle, appellant would then direct McDonald to prepare Western Conference or Joint Council No. 28 checks in payment of these bills. McDonald entered the checks in the books as officers' or convention expense. (Tr. 4464–4467.) Appellant never submitted to McDonald any expense voucher or statement—other than an occasional hotel bill—in support of these checks. But all other officers and employees of the Western Conference and Joint Council— including Brewster (Tr. 5643, 5673–5674) —were required to submit expense vouchers. (Tr. 4467–4471, 4805–4808, 4839, 4882–4885.) Appellant's secretary handled all his regular mail but not mail received by him at the post office box, and she had no knowledge of the fact that he was receiving traveling expenses from union entities other than the International. (Tr. 6711, 6762–6763.) Irrespective of what union entity paid his

appellant. This can be admitted, but does not solve the problem.

■ Once the government proves unreported receipts by a taxpayer, has allowed all the deductions claimed in taxpayer's return, has allowed all deductions developed and discovered in the government's investigation, where it has exhausted all leads suggested or provided by the taxpayer indicating income and deductions, and where the taxpayer chooses to refuse to supply any additional information, the government has established a *prima facie* case, if the income exceeds the deductions and was not reported as taxable. United States v. Bender, 7 Cir. 1955, 218 F.2d 869; United States v. Stayback, 3 Cir. 1954, 212 F.2d 313; Clark v. United States, 8 Cir. 1954, 211 F.2d 100, 103; Remmer v. United States,

hotel bills, whenever appellant was away from Seattle the International Union was billed for the regular hotel allowances.

Appellant did not report in his returns for any of the years in question the receipt of any travel allowances or other such expense monies. (Tr. 10,297–10,310; Exhibits 6 through 9.) In an effort to determine what amounts were actually received and expended by appellant, personally, for travel during the indictment years, Special Agent Gordon Skelton, among other things, solicited hotels in twenty-five major cities in the United States and Hawaii. The agents also analyzed in detail the various bank accounts of appellant and his wife.

During the years 1950, 1951, 1952 and 1953, appellant received from the International Union alone travel allowances totaling $8,188, $7,901, $8,639 and $14,345, respectively. (Tr. 9532–9533.) His known hotel bills for the same period totaled $17,695, of which sum $16,578 was paid by union entities. (Tr. 9535–9539.) No hotel bills—or other travel expense— were paid by checks drawn on the personal bank accounts of appellant or his wife. (Tr. 9559, 9564–9565.) An analysis of the bank accounts, and of all known receipts and expenditures of appellant, disclosed that he had no cash available from reported income with which to pay travel expenses. Accordingly, appellant could not have expended any cash for travel expenses without increasing further the bulge between his reported and his true income for the period. (Tr. 9896–9905, 9917–9918, 10,297–10,310.)

9 Cir. 1953, 205 F.2d 277; United States v. Link, 3 Cir. 1952, 202 F.2d 592, 593; United States v. Hornstein, 7 Cir. 1949, 176 F.2d 217, 220; Barrow v. United States, 5 Cir. 1948, 171 F.2d 286, 287. But see Cohan v. Commissioner, 2 Cir. 1930, 39 F.2d 540, 543–544.

Thus the proof of such unreported income coming to Beck as expense money could support a verdict of guilty of willfully evading the tax. Is that the basis of the jury's verdict in this case, or was it embezzled money? We cannot read the jury's mind, and we conclude it becomes necessary to reverse the conviction of Beck on the four counts relating to tax evasion and order a retrial of that issue, at which time such additional evidence, instructions and special verdict or verdicts, if any, may be placed before the jury as may be deemed necessary by the trial court in view of the law as it has developed since the previous trial, with particular reference to the teachings of the James case, supra.

### VI

Insufficiency of the evidence to support the verdict as to the two counts ("990 Counts") involving returns of the Joint Council Building Association for the years 1950 and 1952.

The appellant asserts the insufficiency of the evidence on these counts because Exhibits 50 and 51 were signed by Brewster, the secretary-treasurer of the union, and by McDonald, the bookkeeper, and prepared by the latter "unassisted, uninstructed, and entirely on the basis of his own assumptions plus a minimal amount of information from John Lindsey, Jr., the building contractor."

The Joint Council Building Association filed its "990" returns each year from 1941 through 1950, 1952 and 1953. The 1942 and 1945 returns were signed by appellant. The 1951 return was delivered to appellant's office for signature by McDonald, because the payments of amounts in excess of $90,000 to John Lindsey, Jr., were "extraordinarily high," and McDonald wanted Mr. Beck to pass on their correctness. (Some $46,000 of the amount paid Lindsey in 1951 was for the personal use and benefit of appellant. Tr. 10,172–10,173.) This "990" form for 1951 was never filed.

The 1950 and 1952 "990" forms *were* filed. The record substantiates the government's contention that they were false in the following particulars:

"The return for 1950 (Ex. 50) reflected an expenditure by the Association of $16,718 for building payments and alterations. Of this sum $13,590 was in fact applied by appellant to his own use and benefit. In addition, the 1950 return reflected an expenditure by the Association in the amount of $18,000 for new construction. Of this sum $8,000 was for the personal benefit of appellant. (Tr. 10,165–10,167.)

"The return for 1952 (Ex. 51) reflects an expenditure by the Association of $54,838 for building payments, alterations and improvements. This entire sum was applied by appellant to his personal use and benefit. It was also reported in the return for 1952 that the Building Association had expended the sum of $15,084 for building equipment, supplies, services and repairs. Of this sum $1,368 was paid to a plumbing firm for work done for appellant personally. (Tr. 10,167–10,171.)" Appellee's Brief, pp. 84–85.

Once the falseness of the returns are established (and appellant fails to attack their falseness), there exists but one ground for reversal on these counts (which appellant urges), to wit, that there is in the evidence no more than a remote suspicion that appellant knew such returns existed.

We read the record otherwise. Beck had himself signed such Form 990 returns in 1942 and 1945. Beck also signed yearly Form 990 returns for the Western Conference Pension Trust Fund, of which he was trustee. McDonald *usually* signed the Joint Council 990 forms. Copies of

each were then placed in the corporate files.

The 1945 Building Association Form 990 (Ex. 45), *signed by Beck*, was false with respect to payments to Lindsey. Payments to him amounting to $5,250 were made by the Building Association, but were for work done by Lindsey on behalf of Beck personally.

We note that on this issue as to the detailed knowledge of the operation of the union and its affiliates and its complete one-man control by Beck, appellant blows both hot and cold. On the issue of Beck's knowledge of what was in the 990 forms there exists, say his counsel, only suspicion that he knew their content. We compare that with the admitted and self-professed single-man control of "the union organizations" by appellant—the lack of *any knowledge* in the governing boards of the corporations—the complete "direction" and "control" by Beck—his "possession" of all moneys and bank accounts—his lack of accountability to anyone for what he did or did not do—financially or otherwise. (See note 6, supra.)

We cannot agree that there existed merely a suspicion of appellant's knowledge as to the returns or that he did not have full knowledge of them and of their content. Nor can we agree that "the circumstantial evidence leads as rationally to a conclusion of innocence as to one of guilt." There was ample evidence to go to the jury on the two "990 counts" and to permit the jury to return a verdict of guilty. This it did. Its finding we will not disturb. We affirm appellants' conviction as to these two counts.

## VII

The alleged error in admitting evidence concerning the loss or destruction of

certain financial records of the union, and the instructions with regard thereto.

▮ The appellant was willing to, and did, stipulate at the trial that *all* records of the union entities and of Beck, which might aid the government in reconstruction of Beck's financial dealings in the years in question, were destroyed. The trial judge allowed the government to introduce evidence of this destruction over objection by Beck. Beck now contends that in view of the stipulation mentioned, the only purpose served by this evidence was to prejudice Beck in the eyes of the jury. The government introduced the evidence purportedly to lay the foundation for the use of the net worth method. The government points out that the proof necessary to such a foundation is a matter of the discretion of the trial judge, and that abuse of that discretion is not here shown.

▮ Beck complains of the instruction given in relation to the destruction of the records, in view of what he calls a complete lack of direct evidence to connect him with the destruction. Beck's complaint addressed to the language contained in instruction No. 19 does not produce conviction.[9] It relies on an emphasis supplied by the appellant, to have any relevance whatever. It is favorable to appellant in its only mention of him. The judge instructed the jury that the fact of destruction, standing alone, had no significance, and appellant complains of undue emphasis allegedly placed on the "standing alone" portion, and asks this court to assume that the jury drew a negative inference from the asserted emphasis. This we will not do. Instructions must be considered as a whole. The jury was properly instructed (Stoneking

9. "Evidence has been received during the trial concerning the loss or destruction of certain records of several persons or organizations, including the Western Conference of Teamsters, Joint Council Building Association, and records of certain banks. Such evidence was permitted for the purpose of laying the basis for the presentation of certain matters by oral testimony, and as a basis for allowing the use of the net worth method, which I will explain to you later. Therefore, you are instructed that the loss or destruction of any such records, in and of itself—that is, standing alone, shall not be considered as a fact adverse to the defendant." (Instruction 19. R. 714.)

v. United States, 8 Cir. 1956, 232 F.2d 385, 389), and we must assume it followed such instructions without confusion (United States v. Davis, 7 Cir. 1960, 281 F.2d 93, 100).

## VIII

Was there error in admitting evidence of appellant's refusal to turn over his records to, or discuss his taxes with, the Internal Revenue Service agents, and in instructing the jury with respect thereto?

 First, we must say we agree with the government that appellant has failed to comply with Rule 18(2) (d) of this court, 28 U.S.C. That rule requires the full substance of the evidence on the subject to be fairly stated. Such evidence is not fairly or fully stated when appellant merely charges "Such testimony [relating to appellant's refusal to turn over his records to the Internal Revenue Service agents] was permitted in far greater degree than necessary for the purpose of laying a foundation for appellee's use of the net worth method." It is fundamental that *some* foundation along such lines was required before the government could proceed under its theory of the case. The amount of foundation is always largely a matter of judicial discretion in the trial court. Beard v. United States, 4 Cir., 1955, 222 F.2d 84, cert. denied, 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753. That discretion was not here abused, either in permitting the evidence to go in, or in refusing the appellant's requested instruction No. 20 with respect to it.[10]

Therefore, while it would be perfectly proper for us to disregard such alleged error because improperly raised, we prefer to consider the question properly raised, and hold there was no error in either of the court's rulings, i. e., either as to its admission or as to the instructions given concerning it.

In summary, the conviction of appellant on the two "990" counts (26 U.S.C. § 3793 (b) (1) are *affirmed*; the conviction of appellant on the four counts of income tax evasion are reversed and set aside, and such four counts are remanded for a retrial in the district court.

---

10. When the court declined to give this instruction as an incorrect statement of the law, then counsel for appellant conceded that the instruction, as requested, was not a correct statement of the law. (Tr. 10,642–10,644.)