James Raymond NEAL, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19616.

United States Court of Appeals Ninth Circuit.

March 8, 1965.

Mark I. Harrison, Langerman & Begam, Phoenix, Ariz., for appellant.

Jo Ann D. Diamos, U. S. Atty., Henry L. Zalut and Richard S. Allemann, Asst. U. S. Attys., Phoenix, Ariz., for appellee.

Before ORR, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Following trial to a jury, appellant, James Raymond Neal, and one James Harvey Thompson were convicted of the offense of violating 18 U.S.C. § 2113.[1] The indictment charged in substance that the appellant and Thompson, by force and violence took from the persons of employees of a national bank approximately $8,486.00 then and there in the custody, control and possession of said national bank.

On this appeal appellant specifies as errors that the District Court erred:

1) In "denying defendant's motions for severance and/or change of venue and in failing" to take proper steps to ascertain whether any juror or jurors were prejudiced against the appellant as a result of having read or heard newspaper and/or TV stories concerning appellant "for the reason that adverse, inflammatory newspaper articles and TV broadcasts concerning defendant prevented him from receiving a 'fair trial'."

2) "In failing to declare a mistrial when a Government witness referred to defendant's 'past criminal history'" since appellant's character was not in issue or relevant to any issue.

In order to place in proper context appellant's specifications of error, it is necessary to summarize the evidence which was presented to the jury. This summary has been taken from appellee's brief to which appellant offers no objection in his reply brief, and which we find from our review of the transcript to be fair and fully supported.

On May 26, 1961, the First National Bank of Arizona, 33rd Street and East McDowell Road, Phoenix, Arizona, was chartered by the Controller of Currency of the Treasury Department of the United States and the deposits at this particular branch were insured by the Federal Deposit Insurance Corporation.

At approximately 3:00 P.M., on May 26, 1961, James Raymond Neal approached Mr. Russell Lee Findlay, Assistant Branch Manager of the First National Bank of Arizona, 33rd Street and McDowell Road, Phoenix, Arizona, who was at the officers' platform located at the south end of the bank, while Mr. Findlay was facing the lobby and talking on the telephone. When Mr. Neal had entered the bank at 3:00 P.M., he was seen by Dorothy Kuhfuss, who was at the back drive-in window closest to the north end of the bank. She had met and known Mr. Neal before May 26, 1961.

At about this time, Mr. Neal confronted Mr. Findlay with an automatic weapon approximately eighteen (18) inches from Mr. Findlay's face. Mr. Findlay was then informed by Mr. Neal that this was a robbery and he was forced at gun point to walk through the swinging gates to the tellers' area to approximately teller window number three (3), about five (5) feet in from the counter in the

---

1. "§ 2113. *Bank robbery and incidental crimes*

"(a) Whoever, by force and violence, * * * takes, * * *, from the person or presence of another any property or money * * *, or in the care, custody, control, management, or possession of, any bank * * *

"Shall be * * * or imprisoned not more than twenty years * * *

* * * * *."

inside of the tellers' area. Teller number three (3) was the third teller from the south end of the bank. This robber was identified by Mr. Findlay as the defendant, James Raymond Neal. In addition, Mr. Neal was unequivocally identified by other witnesses as the bank robber.

Mr. Neal then went from teller to teller distributing a paper sack to each of the five tellers and encouraged them to hurriedly fill the bags with cash. During all of this time the appellant had a revolver. He then proceeded to collect only three of the five bags which the tellers had filled from the respective tellers' buses. Each of the three tellers included in his respective bag a pack of $50.00 bills, totaling $250.00 each, which serial numbers had been previously recorded. One of the unfilled paper sacks was left at the front drive-in window at the south end of the bank by the appellant.

At that time, Mr. Neal told everyone to get down on the floor. Then Mr. Neal left the bank through the east door. Immediately a telephone call was made to the police reporting the robbery. After he left the bank the appellant was seen proceeding in a northerly direction over the bank parking lot.

At about 3:20 P.M., May 26, 1961, the paper bag was recovered from the floor of the drive-in teller cage at the south end of the bank where Mr. Neal had thrown it.

Subsequently, on that same date, between 4:00–4:15 P.M., since no business was conducted after the robbery by the bank tellers, cash sheets of tellers numbers 1, 2 and 3 were prepared reflecting the loss incurred by the bank as a result of the robbery.

Shortly after the robbery a 1953 Ford was observed speeding south on 32nd Street, near McDowell Road, and it proceeded to cut across a service station lot. Since several violations had occurred the vehicle was then followed by a police officer of the Phoenix Police Department. The chase continued west on McDowell Road during which the police officer received a radio call that the bank had been robbed. At this time, the siren of the police car was turned on and the pursuit continued down several side streets during which time the 1953 Ford was attempting to evade the police automobile. Subsequently, the 1953 Ford stopped on Diamond Street, west of 32nd Street, at which time the Phoenix police officer radioed that that the other vehicle was stopping and that the occupant was possibly a suspect in the bank robbery. The police officer drew his service weapon and ordered the occupant of the 1953 Ford to put up his hands and proceed to the police car which the appellant did. Thereupon, the appellant was searched by the police officer and a loaded .38 automatic weapon was found in the right front pocket of Mr. Neal and a knife in his left rear pocket. The time was about 3:15 P.M., on May 26, 1961. Handcuffs were put on the appellant and he was put into the rear seat of the police vehicle.

At approximately this time a detective of the Phoenix Police Department arrived at the scene and observed the appellant with the Phoenix police officer. Then the detective proceeded to look in the 1953 Ford vehicle and observed four brown paper sacks on the front seat. Upon viewing the paper bags they were then opened and three were full of money and the fourth bag had a loaded .22 revolver with a four (4) inch barrel. Thereafter, the money was compared with the list of recorded serial numbers of certain $50.00 packs taken from the bank tellers and the numbers matched.

The paper bag that was recovered from the floor of the drive-in teller cage at the south end of the bank where Mr. Neal had thrown it was submitted to the Phoenix Police Department, Identification Division, for the purpose of possible fingerprint identification. During the processing of the paper bag at the Phoenix Police Department Identification Division Laboratory several latent fingerprints were discovered thereon. After a comparison of the processed latent fingerprints on the paper bag and the known fingerprints of the appellant, it was con-

cluded that the fingerprints on the paper bag were those of Mr. Neal.

On May 26, 1961, subsequent to the appearance and preliminary hearing of Mr. Neal before the United States Commissioner, Phoenix, regarding the charge which is the basis for the appellant's conviction, Mr. Neal was interviewed. Present was a special agent of the Federal Bureau of Investigation and a detective of the Phoenix Police Department. Mr. Neal was then advised that he did not have to talk, that any statement he made would be voluntary on his part, that he had the right to consult with an attorney, that if he did make a statement it could be used in a court of law against him. The appellant then stated that he had cased the bank prior to the robbery of the bank at 33rd Street and McDowell. Mr. Neal also said: that the car used was to be abandoned in Phoenix; that the guns used in the bank robbery had been loaded but he hadn't intended to use them during the robbery; that he had several chances to shoot the arresting officer during the time that he was being arrested but he had no intention of using the gun.

■ We shall first consider the first specification of error. On September 8, 1961, appellant and Thompson filed a motion for an order "severing the offenses charged against defendants in the indictment herein from the offenses charged against the defendant James Raymond Neal or for such other relief as justice may require, on the grounds that defendant Thompson, is prejudiced by the joinder of defendants herein." Following hearing on September 18, 1961, the District Court denied the motion. It does not appear that appellant on this appeal questions the propriety of such order.

The jury trial of appellant and Thompson commenced at 1:30 o'clock p. m., on October 10, 1961. Counsel for the Government and for the defendants announced themselves ready for trial. Twenty-eight jury veniremen were present. Counsel for the defendants advised the court that he wished to make a motion in the absence of the jury, whereupon the court and counsel repaired to the chambers of the District Judge. In chambers, counsel for appellant announced:

"I have been requested by the defendants to renew a motion for severance in this matter. You will recall you have heard this one motion for severance.

"THE COURT: Yes.

"COUNSEL: There is a new ground for the motion for severance, and that is that since the prior motion was argued, there have been certain occurrences at the County jail resulted in adverse publicity to particularly one of the defendants, Defendant Thompson.

"Defendant Neal feels that this adverse publicity has resulted in a prejudice to him by being joined with Defendant Thompson.

"He would also like to move for a change of venue, based upon the newspaper articles and television news commentaries which have carried the names of at least Thompson, and in some cases Defendant Neal, as being members of a Kangaroo Court involved in the beating up of another prisoner.

"He feels [Neal] that these charges against him are unfounded and unproven and tend to color the opinion of the community so that he may not obtain a fair trial here.

"Therefore, on those grounds, I would like to move for a severance of the two defendants and for a change of venue."

The District Court stated to counsel for appellant:

"You can inquire about whether they [veniremen] heard any adverse newspaper publicity, or not, on either of these defendants.

"COUNSEL: I will be allowed to inquire as to whether there is bias or prejudice in reference to the newspaper?

"THE COURT: Well, I always do that in any case.

\* \* \* \* \* \*

"THE COURT: Yes, because every case tried here receives some publicity.

\* \* \* \* \*

"I merely ask whether they have read anything in the newspapers about the case.

"COUNSEL: May I ask that you ask 'or about the defendants'?

"THE COURT: All right."

Whereupon the District Court denied the motions made by appellant's counsel. It appears that on the afternoon on which the trial commenced, the Phoenix evening newspaper contained an article displayed in the right-hand corner of page 9 concerning the beating and torturing of a prisoner in the County Jail. The articles contained the names of appellant and co-defendant and referred to them as "ex-convicts" and as having participated with the most enthusiasm in the torturing and beating of a fellow prisoner. The next day, October 11, 1961, the Phoenix morning newspaper carried an article on page 12 containing similar references to appellant and his co-defendant. The articles are not a part of the record on appeal.

Following the hearing in chambers, trial was resumed in open court and the twenty-eight veniremen were called into the jury box and properly sworn for examination upon voir dire. Following the reading of the indictment, the District Court questioned the entire panel as to their qualifications to serve as jurors and asked the panel "Have you ever read about this case in the newspapers or discussed it with anybody?" Two veniremen stated that they had previously read newspaper accounts but stated that they had formed no opinion as to the guilt or innocence of the defendants. The remainder of the veniremen gave a negative response. The court also asked "Has any juror heard any remarks which caused him to formulate or to have any opinion as to the possible guilt or innocence of the defendants? to which question there was a negative response. Following voir dire examination by the court, counsel for the appellant requested, and was granted, permission to question the veniremen. The transcript of such examination is as follows.

"COUNSEL: May I ask the prospective jurors if any person here has read anything in the newspapers, not of this particular case, but of these defendants, Thompson and Neal? Let me have your hands, if you have.

"A (No show of hands by jurors.)

"Q May I ask the panel if any of you currently receive a government pension?

"A (By a Juror): I draw compensation for a service disability.

"Q Do you feel in any way this economic benefit to you would influence how you feel about this particular case?

"A By the Juror: I don't think so.

"Q I will ask if any person here is related to an employee of the First National Bank, or if any of you own stock in the First National Bank?

"A (Negative indication by Jurors.)

"COUNSEL: That is all the questions I have."

Following such examination twelve of the veniremen were selected as members of the jury to try the case. The two veniremen who had stated that they had read newspaper accounts were not among the twelve selected.

During the course of the trial and prior to each recess when adjourning, the court admonished the members of the jury not to discuss the case among themselves or permit anybody to discuss it with them, and to avoid forming or expressing any opinion on any subject connected with the case.

At the commencement of the second day of the trial, October 11th, counsel for appellant, in chambers, moved the District Court for a mistrial calling the court's attention to the newspaper articles which appeared in the evening paper of October 10th, and to the article which appeared in the morning paper of October 11th. The court stated:

"I will agree with you. I read both articles, and if the jury, or any member of the jury read them, why, you are entitled to a mistrial.

"But we are confronted with this: We don't know whether the jury read those stories.

"I will ask whether they have."

Counsel for appellant then stated:

"I have no knowledge of the television coverage, whether or not it contained any of this material.

"I would, if your Honor would, I would ask that you request if any of them heard any television coverage of this.

"THE COURT: All right."

Counsel then stated:

"But I will leave it, then, to your Honor to ask the questions this morning.

"THE COURT: All right.

"COUNSEL: I think your honor realizes the significance of this.

"THE COURT: Why, no question about it, if they read the story, you are entitled to a mistrial, that's all there is to it, in my humble opinion."

Thereafter the following proceedings were had in open court, in the hearing and presence of the jury:

"THE COURT: Ladies and gentlemen of the jury, there is a question or two I would like to ask before we proceed this morning.

"There was some coverage of this case in the Gazette yesterday afternoon, and some in the Republic this morning.

"How many of you people read those articles?

"(There was no affirmative response by any member of the jury.)

"THE COURT: All right. Did you see any television program last night that had anything to do with this case?

"(Negative response by all members of the jury.)

"THE COURT: And you know nothing whatever about what was published?

"(Negative response by all members of the jury.)

"THE COURT: Your motion is denied. * * *."

Counsel for appellee: "I wonder if it would be in order to admonish them not to read anything further, so we won't have this again.

"THE COURT: All right.

"As long as I have called your attention to this, I will ask the jury not to read any newspaper articles concerning this case during the course of the trial; and I will ask you not to look at any television programs, either, that might have anything to do with it."

The proceedings in open court, before the jury, then continued and was concluded Friday afternoon, October 11, 1961, including arguments of counsel, instructions by the court, and the return of the guilty verdict by the jury.

It appears to be appellant's position that because of the newspaper publicity, the minds of the members of the community from which the veniremen were drawn were so inflamed and prejudiced that it was impossible to find a panel of jurors from that area so as to secure to the appellant a "fair trial", and that the record before us requires, as a matter of law, that we reverse the conviction. We note that outside of calling to the attention of the court that such articles were published, there was no showing that such articles had been read by any member of the community. No member of the jury sworn to try the case had read or heard of such articles. There is noth-

ing in the record showing that there was any television or other media coverage on the matters contained in the newspaper articles.

We find no "manifest" error on the part of the trial court either in denying appellant's motion for mistrial or in denying appellant's motion for change of venue, even if it be assumed that appellant's earlier motion, which was denied by the District Court, had been properly renewed. See Beck v. United States, 298 F.2d 622 (9th Cir. 1962), C.D., 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499.

Appellant also complains that as a matter of law the court "should have sequestered the jury" or should have examined on voir dire each juror separately or individually We have carefully reviewed the voir dire examination of the impanelled jurors and are satisfied that it was so conducted as to result in the selection of a fair and impartial jury. Furthermore, our examination of the entire record demonstrates to us that the appellant was not denied his right to a fair trial. We find it unnecessary to analyze in this opinion the decisions cited by appellant wherein convictions have been reversed where special circumstances existed which operated to deny the accused a fair trial.

■ We shall now consider appellant's second specification of error. On the afternoon of the second and last day of the trial, the Government called as a witness an F.B.I. agent who was ostensibly called to testify concerning certain purported admissions which had been made by the defendant when first taken into custody. The transcript of the proceedings reveals as follows:

"GOVERNMENT COUNSEL: Will you please tell us what was said at that time?

"A. At that time we told Mr. Neal first that we wanted to talk to him about a bank robbery that had occurred in Phoenix, at 33rd Street and East McDowell.

"We advised him that he didn't have to talk to us, that any statement that he made would be voluntary on his part, that he had the right to consult with an attorney, that if he did make a statement to us, it could be used in a court of law against him.

"He told us that he didn't object to talking to us about his past criminal history, but—

"COUNSEL FOR APPELLANT: I object, your Honor.

"THE COURT: All right.

"GOVERNMENT COUNSEL: We yield to the objection, your Honor.

"THE COURT: Disregard it.

"COUNSEL FOR APPELLANT: I move that it be stricken from the record, your Honor.

"THE COURT: Yes, disregard that statement.

"GOVERNMENT COUNSEL: Will you please confine your remarks to what was said by the defendant Neal with respect to this bank robbery."

Appellant contends that the District Court "committed reversible error in failing to declare a mistrial sua sponte." No motion for mistrial was made by appellant's counsel. We note that among the instructions given by the trial court to the jury, and to which no objection was made by counsel, is the following:

"In determining what your verdict shall be, you are to consider only the evidence before you. Any testimony as to which an objection was sustained, and any testimony which was ordered stricken out must be wholly left out of account and disregarded."

■ Our problem is to determine what effect the uncalled for statement of the witness had, or reasonably may be taken to have had, upon the jury's verdict. To make such determination the statement of the witness must not be considered in isolation but must be considered against the entire setting of the case. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We have carefully re-

viewed the entire record. The proof of appellant's guilt [apart from the moment the uncalled-for statement of the witness] was overwhelming and reaches the stage of demonstration. It is our conviction that such statement had little, if any, effect upon the jury's verdict.

The grievous error appearing in the record is appellant's error in robbing the bank and not appellant's specifications of error, either singly or in combination.

The judgment of conviction is affirmed.