CHARLES SMITH and IRENE SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 6556-71
United States Tax Court
T.C. Memo 1976-114; 1976 Tax Ct. Memo LEXIS 292; 35 T.C.M. (CCH) 512; T.C.M. (RIA) 760114; April 12, 1976, Filed *293 Murray M. Weinstein and Samuel J. Weinstein, for the petitioners. John J. O'Toole, for the respondent. DAWSON
DAWSON, Chief Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes and additions thereto: Addition to Tax ,year
Deficiency
Sec. 6653(b) [1]
1959
$ 8,192.71
$ 4,096.36
1960
527.39
263.70
1961
10,178.12
5,089.06
The issues presented for our decision are as follows: (1) Whether petitioners filed false or fraudulent returns with intent to evade tax for each of the years in question, with the result that (a) the statute of limitations does not bar the assessment of deficiencies for such years, and (b) petitioners are liable for the 50 percent addition to tax for fraud. (2) Whether respondent's determinations *294 of unreported income for the years in question are correct. (3) Whether petitioners are entitled to deductions for payments alleged to have been made to a subcontractor. (4) Whether payments made in 1959 and 1961 under equipment lease agreements with options to purchase are deductible as rental expenses or must be capitalized, where the purchase options were exercised within the same taxable years in which the payments were made. (5) Whether the estimated life of a Buick automobile was less than the three-year life claimed by petitioners on their 1960 return. (6) Whether the salvage value of certain equipment should be used in computing the depreciation allowable under the declining balance method, and, if so, whether the equipment involved had a salvage value of less than $3,000. Respondent has conceded that an addition to petitioners' income for 1960, made in the notice of deficiency, in the amount of $758.29 for unidentified bank deposits, was in error. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference. The petitioners, Charles Smith and Irene Smith, *295 are husband and wife, who resided in Cranbury, New Jersey, at the time of the filing of their petition in this case. They filed their joint Federal income tax returns for the years in issue with the district director of internal revenue, Newark, New Jersey. During the years at issue herein petitioner [2] was engaged, as a sole proprietor, in the excavating business, performing such services as land clearing, excavation, grading, sewer work and road work for builder-developers. Petitioner's wife, Irene Smith, assisted in the operation of the business by performing some of the clerical work. Among the builderdevelopers for whom petitioner performed services were Country Club Village, Cyktor Real Estate, Field Construction Associates and Meadow Dell. Petitioner maintained a business checking account at the First Bank and Trust Company (hereinafter called First Bank) in Perth Amboy, New Jersey, and a savings account, number XXXX, at Fords National Bank (hereinafter called Fords National) *296 in Fords, New Jersey. During 1959, petitioner performed work for Country Club Village, a corporation which built and sold single family homes. In return for clearing, excavating, sewer and road work, petitioner received, among others, the following checks, issued by Solomon Punia on behalf of Country Club Village: Bank Account
Date of Check
Where Check Amount
Check No.
(1959)
Deposited
$1,000
950
Jan. 14
Fords National
3,000
1007
Feb. 13
Fords National
7,500
1170
Apr. 27
First Bank
5,000
1315
June 12
First Bank Country Club Village never made any loans to petitioner, though it may have made some advance payments to him for services to be rendered. During 1959, petitioner also received the following checks, for services rendered, which were deposited in petitioners' savings account at Fords National: Date of Check Customer-Payor
Amount
Check No.
(1959)
Acreage, Inc.
$ 324.10
1541
Jan. 30
Liberty Park
1,500.00
639
May 27
Liberty Park
583.92
813
July 3
Midwood Builders
Construction, Inc.
453.00
1031
July 28
Field Construction
Assoc.
572.25
507
July 23
Field Construction
Assoc.
1,000.00
510
July 27
Field Construction
Assoc.
685.69
515
Aug. 5
Field Construction
Assoc.
1,500.00
519
Nov. 3
Field Construction
Assoc.
1,000.00
520
Dec. 22
*297 During 1960, petitioner performed work for Cyktor's Real Estate, chiefly earth moving and clearing. In payment for this work, he received, among others, a check (number 404) for $2,000 dated September 13, 1960, issued by Louis Cyktor, Jr. on behalf of Cyktor's Real Estate. This check was deposited to petitioner's savings account at Fords National. Neither Cyktor's Real Estate nor Louis Cyktor, Jr. ever loaned money to petitioner or his company. During 1960, petitioner also performed excavation and earth-moving work for Field Construction Associates, a business enterprise of Martin Field. He received a check (number 527) for $2,100 dated May 23, 1960, as part payment for this work. He deposited $1,600 of the proceeds of this check in his savings account at Fords National, and did not deposit the remaining $500. In 1961 Martin Field, operating as Meadow Dell, employed petitioner to move extensive amounts of earth. Solely in payment of these services, petitioner received the following checks from Meadow Dell, which checks were not deposited, but were cashed by petitioner: Date of Check Amount
Check No.
(1961)
$6,000.00
1126
Nov. 30
7,573.20
1140
Dec. 22
7,500.00
1141
Dec. 22
*298 Petitioner also received the following checks in 1961 in payment for services rendered: Date of Check Customer-Payor
Amount
Check No.
(1961)
Midwood Builders
and Const., Inc.
$237.00
2956
Jan. 31
and Const., Inc.
37.50
2066
Apr. 17
Bob Nyce
71.00
779
July 7
Bob Nyce
270.00
780
July 14
Torgon Builders, Inc.
500.00
683
Sept. 20
During the years at issue petitioner employed John J. Hayes, a public accountant, to keep his business books and records. Hayes also prepared and filed petitioners' income tax returns for these years. All of such returns were submitted to petitioner for his review prior to filing. In preparing petitioners' income tax returns, Hayes computed gross business receipts and business expenses solely with reference to the transactions in the business checking account at First Bank. Accordingly, none of the checks referred to in the foregoing Findings of Fact, which were deposited in the savings account at Fords National or which were cashed and not deposited, were included in the reported gross income as computed by Hayes solely from the deposits at First Bank. Hayes was either unaware of the checks which were *299 not deposited in the business checking account, or if he was aware of any such receipts, he was advised by petitioner that they did not represent reportable income. In addition, the two checks received from Country Club Village for services performed in 1959, referred to above (checks numbered 1170 and 1315), which were deposited in the business account at First Bank, were excluded by Hayes from the total reported business receipts, upon the representation by petitioner to Hayes that such checks represented loans to the business and not income items. During 1958, the year in which petitioner commenced his excavating business, petitioner rented certain equipment, with operator, from Louis Robustelli. Petitioner paid Robustelli a total of $24,492.18 for such equipment rental, in 12 separate checks, during 1958. Robustelli died in 1962. Petitioner was indicted under section 7201 for evasion of income taxes with respect to the year 1959. To this indictment he entered a plea of guilty. In the operation of his business petitioner utilized a variety of heavy equipment, such as bulldozers and road scrapers. Petitioner owned some of his own equipment, and from time-to-time he would *300 lease or rent additional equipment as the needs of the business required. On March 24, 1959, petitioner entered into a "Contract of Lease" with Hubbard and Floyd, Inc., for two Model S-7 Euclid Motor Scrapers. This lease [3] provided for "rent" of $2,800 per month, with a minimum term of three months. On the same date the parties executed a purchase option agreement, made a part of the lease contract, granting petitioner the option to purchase this equipment within six months for $34,000. The purchase option further provided that the amounts paid and designated as rentals would be fully applied to the purchase price. On March 30, 1959, petitioner entered into another "Contract of Lease" with Hubbard and Floyd, Inc. This time the item leased was a Model D-8 Caterpillar Crawler Tractor with Bulldozer attachments. This lease provided for "rent" of $1,200 per month for a minimum period of *301 three months. On the same date the parties executed a purchase option, made a part of the lease contract, granting petitioner the option to purchase this equipment within six months for $8,000. The purchase option further provided that the amounts paid and designated as rentals would be fully applied to the purchase price. At the time that the 1959 Hubbard & Floyd agreements were entered into, petitioner was uncertain as to the future volume of business that he would be handling. On August 28, 1959, petitioner exercised the options for the scrapers and the tractor-bulldozer and a Contract of Conditional Sale was executed. At the time the option was exercised, petitioner had paid a total of $20,500 (including $500 for repair parts) under the leases, which amount was fully applied toward the purchase price pursuant to the contracts. The balance of the purchase price, plus a financing charge of 10 percent of such balance, was to be paid in 22 monthly installments. On his return for 1959, petitioner capitalized the total cost of these equipment purchases, including the rent paid which had been credited against the purchase price. Depreciation was claimed using a cost basis of $42,000, *302 the amount of the purchase contract, and an estimated life of three years. The 150 percent declining balance was used. In addition to the foregoing, two other pieces of equipment were purchased by petitioner outright (without prior lease period) in August and September of 1959, with bank financing. On March 4, 1961, petitioner entered into a "Contract of Lease" with Hubbard and Floyd, Inc. for two Euclid Scrapers. The lease provided for rent of $3,000 per month. On the same date the parties entered into an agreement that petitioner would have the option to purchase these scrapers for $22,191.19. This agreement provided that the amounts paid as rent would be fully applied against the purchase price. On April 21, 1961, petitioner entered into an Equipment Lease Agreement with Foley Machinery Company for a used Model MD21 Allis Chalmers Loader. This agreement provided for rent of $1,000 per month for a minimum term of 12 months and contained an option to purchase the equipment for $12,900. The portion of the agreement setting forth the purchase option contains the following language: * * * in the event Lessee elects to so purchase any item of the leased equipment there shall be *303 applied upon the purchase price 100 per cent [sic] installments of rent under this lease theretofore paid to Owner by Lessee upon the (items) or leased equipment being purchased * * * with interest of 1/2 of 1 percent per month on original purchase price. After five months, during which a total of $5,000 had been paid as rent for the scrapers and $15,000 had been paid for the use of the loader, petitioner exercised the purchase options. In his 1961 return these purchases were capitalized and depreciated, using a cost basis of $23,481 [4] for the scrapers and $12,900 for the loader and an estimated useful life of three years. The acquisition dates were stated to be 3/31/61 for the scrapers and 4/13/61 for the loader. The 150 percent declining balance method was used for these items. In December of 1960 petitioner purchased a 1955 Buick automobile for $1,000. The *304 automobile was to be used on construction jobs over rough and rutty terrain. In his return for 1961 petitioner computed depreciation on the Buick, using the straight-line method and a 3-year useful life. Petitioner disposed of the Buick in 1963 or 1964 after a period of non-use. In 1959 petitioner purchased two D-6 bulldozers at costs of $19,770 and $20,260, respectively. In his returns for the years in question petitioner claimed depreciation on these two bulldozers, using the 200 percent declining balance method and a 3-year useful life. Petitioner's 1961 return reflected the following in connection with these two bulldozers: Depreciation Allowed
(or Allowable)
Depreciation Cost or Other Basis
In Prior Years
This Year
$19,770
$15,010
$3,174
20,260
14,988
3,514 After a period of use, these two machines were eventually rebuilt by petitioner at considerable cost. In his 1960 and 1961 returns petitioner claimed depreciation deductions on a D-7 bulldozer (acquired at a cost of $25,131 in 1960), using the straight-line method, a 3-year useful life, and a salvage value of $1,000. Respondent has not challenged the $1,000 salvage value, even though *305 he did adjust the 1960 depreciation computation of this machine for other reasons. ULTIMATE FINDINGS OF FACT (1) For each of the years 1959, 1960 and 1961 petitioner filed a false and fraudulent return with intent to evade tax. (2) Petitioner received payments for services in the following amounts which were not included in his gross income reported for the respective taxable years: 1959 - $25,104.79; 1960 - $4,100; 1961 - $22,188.35. (3) Petitioner did not make any cash payments to a subcontractor named Robustelli during the years 1959, 1960 or 1961 which were not deducted in his returns for those years. (4) The three agreements with Hubbard & Floyd were intended by the parties to be leases with options to purchase, and the 1961 agreement with Foley Machinery Co. was intended by the parties to be an installment sale, and not a lease. (5) The useful life of the 1955 Buick purchased by petitioner in 1960 was three years. (6) The two D-6 bulldozers purchased by petitioner in 1959 had salvage values of $1,000 each at the end of their respective 3-year useful lives. OPINION 1. Additions to Tax for Fraud and Statute of Limitations
The notice of deficiency herein *306 was issued more than nine years after the filing of petitioner's tax return for the most recent of the taxable years at issue, long after the normal 3-year statute of limitations had precluded the assessment of such deficiency. Sec. 6501(a). For respondent to prevail, he must demonstrate the applicability of section 6501(c)(1), which permits a deficiency to be assessed at any time in cases where the taxpayer has filed a "* * * false or fraudulent return with the intent to evade tax." To do so it is respondent's burden to prove fraud by clear and convincing evidence. [5] Sec. 7454(a); Drieborg v. Commissioner,225 F. 2d 216 (6th Cir. 1955), affg. in part, revg. in part and remanding a Memorandum Opinion of this Court; Rule 142(b), Tax Court Rules of Practice and Procedure.
*307 During the years in issue petitioner operated a construction business as a proprietorship, performing various services, including excavation, grading and paving for builder-developers. His individual income tax returns were prepared by his accountant, John J. Hayes, who also kept certain books and records of petitioner's business. Throughout the period in question petitioner maintained a business checking account, as well as a savings account. Hayes computed petitioner's gross income for each of the years at issue by totaling the deposits to petitioner's checking account, after deleting from income certain deposits identified by petitioner as the proceeds of loans. Respondent has demonstrated convincingly, through the presentation of canceled checks, and through the testimony of builder-developers for whom petitioner performed services, that in 1959, 1960 and 1961 petitioner received numerous checks in payment for services, the proceeds of which did not appear in his reported gross income for those years. Some of these checks were characterized by petitioner to Hayes as loans at the time that Hayes prepared petitioner's tax returns. Others were cashed without Hayes' knowledge or *308 were deposited in petitioner's savings account and represented to Hayes as nonbusiness receipts. It is clear that substantial business receipts in each of the years at issue were not included in petitioner's gross income and that it was his intention that they should not be so included. In fact, petitioner has made virtually no effort to either deny that such unreported amounts were received or to establish that they were not business receipts, relying instead upon his claim, dealt with hereinafter, that any unreported income was offset by unclaimed deductions. Evidence of a failure to report income, standing alone, is not ordinarily sufficient to establish fraud, Merritt v. Commissioner,301 F. 2d 484 (5th Cir. 1962), affg. a Memorandum Opinion of this Court, but a consistent and intentional understatement of income, as here, is an important indication of fraud, which, when accompanied by other so-called badges of fraud, constitutes clear and convincing evidence that the proven understatements are the product of an intent to evade the payment of tax. Merritt v. Commissioner,supra; *309 Kathleen C. Vannaman,54 T.C. 1011 (1970). The record in this case contains ample evidence from which the intent to evade tax may be inferred. Petitioner intentionally misled the accountant who prepared his returns, by misinforming him as to the source of certain deposits. Merritt v. Commissioner,supra;Jacob D. Farber,43 T.C. 407 (1965). Respondent's witnesses, who were builder-developers from whom petitioner received payments which were not included in his reported taxable income, testified convincingly that such payments were made for services rendered by petitioner. Petitioner's attempts to cast doubt on the testimony of these witnesses were minimal and unconvincing. Moreover, petitioner maintained a personal savings account into which business receipts were deposited unbeknownst to his accountant. Jacob D. Farber,supra.
We note, in addition, that the records of petitioner's business during the years at issue were wholly inadequate. The only available documents from which petitioner's income and expenses may be computed are the records of his checking and savings accounts. This failure to keep adequate records *310 may also be construed as indicative of an intent to defraud. Leon Papineau,28 T.C. 54 (1957). Finally, petitioner pleaded guilty to, and was convicted of, a charge of criminal tax evasion for the year 1959, one of the taxable years here at issue. This judgment of conviction precludes him from contesting the fraud issue as to that year. Arctic Ice Cream Co.,supra, and also evidences fraudulent intent with respect to the continuance of the pattern of failure to report business receipts in the two subsequent years. Jacob D. Farber,supra at footnote 10; Wilson v. U.S., an unreported case ( D. Minn. 1960, 5 AFTR 2d 1653, 60-2 USTC par. 9500). Petitioner defends himself against the charge of fraud by asserting that he had no intention of understating his taxable income since his deductions for the years in question were understated by at least as much as were his gross business receipts. The petitioner has the burden of proving this. United States v. Bender,218 F. 2d 869, 871-872 (7th Cir. 1955), cert. denied 349 U.S. 920 (1955). The linchpin of this contention is petitioner's testimony that in *311 each of the years at issue he paid a subcontractor, a Mr. Robustelli, substantial amounts of cash, which were not disclosed to petitioner's accountant, Hayes, and were not claimed as deductions in petitioner's returns. Petitioner testified that Robustelli, who had been paid by check for previous work for petitioner in 1958, demanded in early 1959 that all future payments be made in cash, due to certain "problems with unions." At the same time Robustelli is alleged to have requested that the cash payment arrangement remain secret. Petitioner contends that he paid Robustelli approximately $24,000 in 1959, $4,000 in 1960, and $23,000 or $24,000 in 1961, all in cash, and none of which was deducted on petitioner's tax returns for those years. Unfortunately, the record in this case is devoid of evidence to corroborate petitioner's testimony concerning the alleged payments to Robustelli. Robustelli had died prior to the trial hereof. However, the unavailability of Robustelli as a witness did not preclude corroboration of the alleged cash payments. Petitioner testified that his wife, co-petitioner herein, was the person who actually delivered the cash payments to Robustelli, yet petitioner *312 did not call her as a witness to verify having delivered the payments. This gives rise to the presumption that if she had been called as a witness she would not have been able to confirm petitioner's testimony. Wichita Terminal Elevator Co.,6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). Further doubt is cast on petitioner's story by the testimony of one of respondent's revenue agents who thoroughly investigated books and records of Robustelli's business for the years in question and found no evidence of any kind of cash payments from petitioner. Even if Robustelli's reasons for demanding cash payments had been because of some concern with union problems, it does not necessarily follow that such payments would not have been reflected on his books, unless we were to engage in the unwarranted supposition that he was also fraudulently secreting income. Additionally, we note that if the alleged cash payments had in fact been made to Robustelli, it seems highly unlikely that payments of such magnitude would not have been claimed as deductions in the original tax returns for the years at issue. We would not expect petitioner's accommodation *313 of Robustelli's alleged union difficulties to extend to petitioner's foregoing allowable business expense deductions in order to preserve the secrecy of the payments. Petitioner claims to have kept a record of his payments to Robustelli on a note pad, which he could not produce at trial. The only evidence of such payments available to us is petitioner's own selfserving testimony. Such testimony, standing alone, is not sufficient to enable us to accept petitioner's belatedly claimed deductions. Carmack v. Commissioner,183 F. 2d 1 (5th Cir. 1950), affg. a Memorandum Opinion of this Court, cert denied 340 U.S. 875 (1950); Frank Imburgia,22 T.C. 1002 (1954). In view of the clear and convincing evidence of fraud presented by the respondent and the lack of an adequate explanation by the petitioner, we find that the respondent has carried his burden of proof. As we stated in Arlette Coat Co.,14 T.C. 751, 756 (1950): Where over a course of years an intelligent taxpayer and business man has received income in substantial amounts, as shown by this record, and has failed to report that income, and where no books or *314 records were kept by him and no tenable explanation was offered for the failure to report the income received, the burden of the respondent, in our judgment, is fully met. Accordingly, it follows that the statute of limitations does not bar respondent's assessment of deficiencies for the years at issue. In addition to the deficiencies, respondent has determined a 50 percent addition to tax, pursuant to section 6653(b), for fraudulent underpayment of tax in each of the three years at issue herein. Our finding that petitioners filed a false and fraudulent return with intent to evade tax is also dispositive of the issue of fraudulent underpayment of tax for purposes of section 6653(b), and petitioner is liable for the 50 percent addition to tax with respect to the deficiencies redetermined by the Court. 2. Determination of Unreported Income
Having resolved the issue of fraud, we turn next to a consideration of the correctness of the deficiencies determined by respondent. Petitioner has challenged several of respondent's adjustments to his reported income, and has also claimed certain deductions not previously claimed in the returns as filed. As to all of these issues, petitioner *315 bears the burden of proof. Although petitioner has done little to contest respondent's determination, and our finding, that petitioner received substantial business income which he failed to report in his returns, petitioner has challenged the correctness of the amounts of such unreported income as determined by respondent. Specifically, petitioner asserts that certain of the checks stipulated (and one check not stipulated but determined by respondent) to have been received by petitioner from various builder-developers were not shown by respondent to have represented payments for services (rather than loans or joint venture transactions). Petitioner points out that although respondent called as witnesses the builder-developers who wrote these checks, and they identified some of the stipulated checks as payment for services, they were not asked to make such identification as to all of such checks. Petitioner asserts that the checks not specifically identified by the witnesses have not been shown to be payments for services. In making this contention, petitioner fails to recognize that he, and not respondent, bears the burden of proof as to this matter. Blaine S. Fox,61 T.C. 704, 712 (1974). *316 Respondent's determination of unreported income is presumptively correct unless error is established by petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure. Although respondent bore the burden of proof as to the fraud issue, we have found that he has carried that burden through adequate evidence of intentional understatements of income. Once this burden has been met through respondent's evidence taken as a whole, petitioner must bear the burden of establishing error with respect to any specific item in respondent's determination of deficiency. Thus, it was petitioner's responsibility to question the witnesses if he wished to establish that certain checks, neglected in respondent's direct examination, represented loans or other nonincome items. He made no attempt to do so, or to otherwise establish that any of the unreported checks were other than income items. Accordingly, respondent's determinations of unreported income for each of the years in question are sustained. In deciding the fraud issue we have disposed of petitioner's claim for additional deductions for alleged cash *317 payments to Robustelli. 3. Payments under Equipment Lease Agreements
In 1959 and 1961, petitioner entered into several agreements for the rental of construction equipment to be used in his business. These rental agreements contained options to purchase the equipment, the amounts paid and designated as rentals to be applied toward the purchase price. In each of the instances at issue herein petitioner exercised his option and purchased the equipment within six months after, and within the same calendar year as, the date of entering into the lease agreement. In these circumstances respondent has determined that the periodic payments originally designated as lease rentals were in substance installment payments for the eventual purchase of the equipment and must be treated as capital expenditures and not deductible rental payments. Petitioner's accountant originally treated the subject payments in this manner in petitioner's 1959 and 1961 returns, but petitioner now contends that such treatment was incorrect, and that the periodic payments prior to exercise of the purchase options were properly deductible as rent. In form the contracts under which the petitioner took possession *318 of the equipment were leases with options to purchase. Our decision, however, must be grounded on the substance of the transactions rather than the form in which they were cast. East Coast Equipment Co.,21 T.C. 112 (1953), affd. 222 F. 2d 676 (3d Cir. 1955); Truman Bowen,12 T.C. 446 (1949). The critical factor in determining the substance of the transactions is the intent of the parties when the agreements were executed. Benton v. Commissioner,197 F. 2d 745 (5th Cir. 1952), revg. a Memorandum Opinion of this Court. For the reasons discussed below, we think the three agreements with Hubbard & Floyd (two in 1959 and one in 1961) were intended by the parties to be, and in substance were, lease with options to purchase, and that the 1961 agreement with Foley Machinery Co. was intended by the parties to be, and in substance was, an installment sale, and not a lease. During the years in issue petitioner obtained the equipment needed in his business from time-to-time as his needs required. Sometimes he would purchase the equipment outright (without leasing it first); sometimes he would rent equipment (often with *319 operators); and sometimes he would lease equipment with an option to later purchase it. Petitioner's business was cyclical and seasonal; his equipment needs varied with the size and number of jobs he obtained. Petitioner's business was relatively new at the time that he entered into the 1959 lease-purchase agreements with Hubbard & Floyd. He did not have enough future work lined up to warrant an outright purchase of the Hubbard & Floyd equipment, yet such a purchase would have been preferable to continued leasing if the volume of business should later warrant. In such circumstances a lease with option to purchase is a sound, perhaps ideal, business approach. We believe that this was the business situation in the instant case and that the inclusion of a purchase option in the three Hubbard-Floyd agreements did not indicate a positive intention of petitioner to purchase, but merely a hope or a possibility of later purchasing. See Breece Veneer & Panel Co. v. Commissioner,232 F. 2d 319 (7th Cir. 1956). Some of the equipment which petitioner acquired during the years at issue was purchased outright, without a prior period of lease. This tends to indicate that when *320 petitioner determined to purchase equipment he did not attempt to disguise the transaction, for income tax purposes, as a lease with option to purchase, and that, therefore, these Hubbard & Floyd transactions were legitimate leases without a clear intention to buy. Moreover, we agree with petitioner's contention that if it was his desire to purchase the equipment at the outset, he would probably have financed the purchase with a bank, which would have allowed a much longer payment period with lower monthly payments than those which he paid to Hubbard & Floyd during the lease period. Petitioner did in fact finance through a bank, two other outright equipment purchases (without prior lease period) in 1959. In analyzing the economic substance of leasepurchase transactions of the type involved herein, it is appropriate to examine whether the lessee is bound to pay, either as rent or payments on the purchase price, an aggregate total substantially equivalent to the value of the property which is the subject of the agreement. Such an agreement would indicate that a sale was intended. Breece Veneer & Panel Co.,supra.This does not appear to be the situation in the case of the *321 three agreements with Hubbard & Floyd. The two Hubbard & Floyd agreements in 1959 were for minimum terms of three months each, with the minimum rental in each case totaling substantially less than half of the purchase option price. The 1961 Hubbard & Floyd agreement was a verbal one, and thus the record does not indicate what the required minimum rental term was, if any. The record does indicate, however, that only slightly over 25 percent of the purchase price had been paid in the form of rent at the time that the purchase option was exercised. We have found and we hold that the three agreements between petitioner and Hubbard & Floyd were leases with options to purchase, and not conditional (installment) sales agreement. [6] Accordingly, the monthly payments designated as rentals under such agreements are deductible as rent for the taxable years in which paid, in lieu of the depreciation deductions originally claimed with respect to the leased equipment. *322 The 1961 agreement with Foley Machinery Co. presents a different situation. Of particular significance here is the fact that petitioner was required to pay a minimum rent ($12,000) equivalent to more than 92 percent of the purchase option price ($12,900). Truman Bowen,supra at 463. Thus, at the end of the one-year lease term he could have purchased the equipment for only $900, or less than a single month's rent. In such circumstances, when petitioner, at the outset of the lease, is obligated to pay an aggregate amount nearly equal to the full purchase option price, the conclusion is virtually inescapable that ultimate purchase of the equipment was intended by the parties. Holeproof Hosiery Co.,11 B.T.A. 547 (1928). The only reasonably possible circumstances under which one could conclude otherwise would be if the lease-purchaser had reason to believe at the outset of the lease that the equipment, after the 12-month lease term, would be so worn out that it would no longer be worth even $900. That, apparently, was not the case here, since petitioner did eventually purchase the equipment. Moreover, we note that the Foley Machinery Co. agreement contained *323 a clause providing for "interest of 1/2 of 1 percent per month on original purchase price" if the purchase option were exercised. Such a clause clearly indicates that the parties viewed the transaction as a purchase, as of the date that the agreement was entered into. Since the interest charge was computed upon the original purchase price, such interest must be viewed as representing the seller's fee for financing of installment payments. [7] Although title did not pass to petitioner upon execution of the agreement, the seller's retention of title, in the circumstances, must be viewed as simply a security device for the installment payments. Accordingly, we have found, and we hold, that the 1961 agreement between petitioner and Foley Machinery Co. was in substance a conditional (installment) sales contract, and not a lease with option to purchase, *324 and that payments by petitioner pursuant thereto were capital expenditures, and not deductible rent. 4. Automobile Depreciation
Petitioner purchased a 1955 Buick in December of 1960 for use in his business. Although in his computation of depreciation in his 1961 return, he claimed a useful life of three years for this vehicle, he now claims that the vehicle had only a one year useful life and that the depreciation deduction for 1961 should be increased accordingly. The only proof offered by petitioner on this issue was his own estimate that, because the car would be used on construction sites, over rough and rutty terrain, it had a useful life of one year from the time of purchase. We do not consider this self-serving testimony sufficient to satisfy petitioner's burden of proof. Petitioner testified that he continued to own the car until 1963 or 1964. Although he claimed that it was not being used at the time it was disposed of, he could not recall when he stopped using it. Moreover, the fact that a 3-year life was utilized in the original 1961 return tends to indicate that petitioner viewed a 3-year life as a proper estimate at that time. In any event, he has failed to explain *325 the inconsistency between the three years claimed at that time and the current belated one year estimate. Accordingly, we have found, and we hold, that the proper useful life for computing depreciation of the Buick automobile purchased in 1960 was three years. 5. Depreciation on Bulldozers
In his 1961 return petitioner claimed a deduction for depreciation of two bulldozers in the amounts of $3,174 and $3,514, respectively. These amounts were arrived at by application of the 200 percent declining balance method (three-year useful life), which method had been used since the assets were acquired in 1959. Prior to the 1961 depreciation deductions, these two bulldozers had remaining undepreciated costs of $4,760 and $5,272, respectively. Respondent determined that the bulldozers each had a salvage value of $3,000, and that depreciation in 1961 must be limited to an amount which would not reduce the remaining cost basis of each below the $3,000 salvage value. Thus, respondent allowed depreciation of only $1,760 and $2,272, respectively, in lieu of the higher amounts claimed. Petitioner contends that no real salvage value should be assigned under the 200 percent declining balance *326 method, since the mechanics of this method result in a "built-in" salvage value equal to the remaining undepreciated balance after the depreciation taken over the 3-year useful life. Alternatively, petitioner contends that the salvage value of the two bulldozers in question was not more than $1,000 each. Petitioner's application of the declining balance method with the so-called "built-in" salvage value is clearly incorrect. Section 1.167(b)-2(a) of the Income Tax Regulations provides, in pertinent part, the following concerning the declining balance method: * * * While salvage is not taken into account in determining the annual allowance under this method in no event shall an asset (or an account) be depreciated below a reasonable salvage value. The examples which follow the above quotation in the regulations clearly demonstrate that the salvage value referred to is independently determined and is not the "built-in" product of the mechanics of the method. The determination of the proper salvage value for depreciation purposes is a question of fact. Petitioner *327 testified that at the end of their estimated 3-year life these bulldozers, which cost approximately $20,000 each new, would have a salvage value of no more than $1,000. He also testified that the machines were in fact completely rebuilt after a period of use, although the record is not clear whether the rebuilding was before or after the expiration of the 3-year estimated useful life. The claimed $1,000 salvage value is also consistent with the $1,000 salvage value which was claimed in petitioners' 1960 and 1961 returns in the depreciation of another (D-7) bulldozer on the straight-line method. We consider it of some significance that respondent did not challenge the $1,000 salvage value claimed with respect to this other bulldozer, even though it was a more expensive machine (costing $25,131). Respondent asserts that petitioner's testimony that the D-7 bulldozer was in service for about four years indicates that the salvage value after the 3-year useful life used in computing depreciation must have been greater than $1,000, and that the same would be true in the case of the D-6 bulldozers at issue herein. Respondent's conclusion does not necessarily follow, however, since the D-7 *328 bulldozer, being a more expensive machine, might have been expected to have a longer useful life than the D-6 bulldozers. Moreover, even if the D-6 bulldozers had been in service for four years, rather than three (a fact not determinable from the record), it does not necessarily follow that they must have had a fair market value in excess of $1,000 after three years. Accordingly, we have found and we hold that the two D-6 bulldozers in question each had salvage values of $1,000 for purposes of computing allowable depreciation. To reflect the conclusions reached herein on the disputed issues, Decision will be entered under Rule 155.
Footnotes
*. Pursuant to a notice of reassignment sent to the parties on January 27, 1976, and to which no objections were filed, this case was reassigned on February 23, 1976, from Judge Austin Hoyt to Judge Howard A. Dawson, Jr.↩, for disposition. 1. All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. References herein to "petitioner" in the singular are to Charles Smith; his wife, Irene Smith, is a party in this case solely by reason of having filed joint returns for the years in question.↩
3. Our use of the terms "lease", "rent", etc. in the Findings of Fact in connection with the contracts entered into by petitioner is for narrative convenience only and is not intended as a factual conclusion regarding the true nature of such contracts, which matter is one of the issues herein.↩
4. The reasons for the differences between the cost basis of $23,481, as reflected in the return and (a) the original purchase option price of $22,191.19, as stipulated by the parties herein, and (b) the purchase price of $23,360 reflected on the Hubbard & Floyd sales invoice, are not determinable from the record.↩
5. Petitioner has conceded that he is estopped from contesting the fraud issue with respect to the year 1959 by reason of his having pleaded guilty to an earlier criminal charge of income tax evasion for that year. See Arctic Ice Cream Co.,43 T.C. 68 (1964), acq. 1966-2 C.B. 4↩.
6. Petitioner also attempted to demonstrate that the lease rates paid to Hubbard & Floyd were not in excess of the fair rental value of comparable equipment and that therefore he was not building up an equity in the equipment through excessive lease payments. See Earl L. Lester,32 T.C. 711↩ (1959). However, the evidence submitted in this connection was inconclusive.
7. By way of contrast, we note that the financing charge which was applied with respect to the equipment purchased from Hubbard & Floyd in 1959 was applied only with respect to the unpaid balance↩ of the purchase price at the time the purchase options were exercised (to be paid in installments) and not to the entire purchase price.