FELIPE P. RIVERA and CECILIA R. RIVERA, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rivera v. Commissioner
Docket No. 5597-76.
United States Tax Court
T.C. Memo 1979-343; 1979 Tax Ct. Memo LEXIS 185; 38 T.C.M. (CCH) 1338; T.C.M. (RIA) 79343; August 28, 1979, Filed Maurice F. Twitchell, for the petitioners. John O. Kent, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Addition to Tax
Sec. 6653(b),
Year
Deficiency
I.R.C. 1954
1968
$11,815.08
$ 5,907.54
1969
30,542.42
15,271.21
1970
23,569.53
u1,784.77
*186 After concessions, the issues for decision are: (1) whether partitioners understated their income during each of the years at issue; (2) whether any portion of the underpayment in tax in 1968 through 1970 was due to fraud on the part of petitioner Felipe Rivera; and (3) whether the statute of limitations bars assessment and collection of the deficiencies. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits [1] thereto are incorporated herein by this reference. Petitioners Felipe P. Rivera and Cecilia R. Rivera, husband and wife, resided in Ghuadalupe, *187 California, at the time their petition in this case was filed. Petitioners filed their 1968 through 1970 joint Federal income tax returns with the District Director of Internal Revenue, Los Angeles, California. The controversy herein relates to the income and expenses of a business conducted by petitioner Felipe P. Rivera. Accordingly, he will sometimes hereinafter be referred to as petitioner. During each of the taxable years 1968, 1969, and 1970, petitioner was the owner and operator of a farm labor business known as Rivera Farm Help, located in Guadalupe, California. The principal business of Rivera Farm Help was to provide agricultural laborers to farmers for a fee. As a secondary line of activity, Rivera Farm Help provided crop hauling services tofarmers. Rivera Farm Help sometimes supplied small tools and other items needed in the farm work it contracted to perform. Petitioner, and not the farmers, had the responsibility of paying the laborers who were employed to do the actual farm work. Petitioner's charges to the farmers would include an amount sufficient to cover the laborer's wages plus an additional amount representing petitioner's fee. Many different methods *188 were used to calculate the charges for farm labor contracting services provided by Rivera Farm Help. During 1968 through 1970, petitioner billed farmers to hoe, thin, cut, tie, weed, irrigate, pack, harvest, and haul crops as follows: (1) Specified price per pound, basket, or crate, plus a percentage commission. (2) Specified price per man-hour plus a percentage commission. (3) Specified price per row plus a percentage commission.
(4) Specified price per acre plus a percentage commission.
(5) Specified price per pound or basket without a percentage commission. (6) Specified price per acre without a percentage commission. The "specified price" or piece-rate component of the billing formula varied greatly from crop to crop and farmer to farmer, as well as over time. In those cases where petitioner charged a percentage commission, however, his commission rate, to the extent shown by the record, was fixed at 16 percent in 1968, 16 percent in 1969, and 18 percent (in a relatively few instances, 16 percent) in 1970.The workers supplied by Rivera Farm Help were generally familiar with, and occasionally inquired about, the amount of the piece-rate component of the charges *189 made by petitioner to the farmers. For the years 1968, 1969, and 1970 petitioner employed a professional income tax preparer. The return preparer specifically instructed petitioner to provide her with all information regarding his gross receipts and expenses. The only records of any sort which petitioner gave to the return preparer in respect of Rivera Farm Help for the years 1968 through 1970 consisted of check stubs, plus some hauling receipts. In accordance with petitioner's instructions, the income tax preparer computed gross receipts (gross income) for Rivera Farm Help by taking total "payroll" as disclosed by petitioner's check stubs and adding a percentage commission; hauling receipts were then added to this figure.For the taxable years 1968, 1969, and 1970, petitioner directed his tax return preparer to utilize a commission rate of 15 percent for purposes of computing gross income. The following schedule summarizes the income tax preparer's computation of the amount of gross income for Rivera Farm Help (as reported on petitioner's 1968, 1969, and 1970 Schedule C forms): 1968
1969
1970
Wages
$103,167.13
$174,328.91
$158,838.04
Commission
15,475.07(15%)
26,199.34(15%)
24,826.60(15.5%) [2]
Subtotal
$118,642.20
$200,528.25
$183,664.64
Hauling Receipts
7,496.00
7,950.60
8,453.40
Gross Receipts
per Schedule C [3]
$126,138.20
$208,478.85
$192,118.04
*190 The parties have stipulated that during the years 1968 through 1970 petitioner received, for services rendered by Rivera Farm Help, the following aggregate amounts from 28 specifically identified persons and companies presumably engaged in farming activities: Year
Amount
1968
$149,522.74
1969
262,134.48
1970
240,518.25
However, although each of these amounts exceeded the corresponding amount of gross income reported for Rivera Farm Help on the respective income tax returns for the corresponding years, the stipulation does not preclude the inference that petitioner may have received gross income from all sources attributable to Rivera Farm Help even in excess of the stipulated amounts during each of the years. And, as further stipulated and found hereinafter, the actual aggregate amounts of gross income received, determined in accordance with an analysis of petitioner's bank deposits for the years *191 involved, were as follows: Year
Amount
1968
$167,372.63
1969
282,507.51
1970
254,656.61
In his Schedule C forms for Rivera Farm Help petitioner claimed business deductions for items such as wages, workmen's compensation insurance, payroll taxes and depreciation in the following amounts: Year
Deductions
1968
$122,565
1969
203,180
1970
181,815
The preparer determined the amounts of the deductions for wages, workmen's compensation insurance and payroll taxes by reference to payments reflected in petitioner's check stubs. The depreciation deductions were based on information provided to the preparer by petitioner in response to the preparer's inquiries concerning his business assets. The return preparer knew of no cash payments of wages, payroll taxes or workmen's compensation insurance during the years at issue that were not reflected in the check stubs or not claimed as deductions on the Rivera Farm Help Schedule forms. The net income from Rivera Farm Help reported in the Schedule C forms for the years 1968 through 1970 was as follows: Net Income
Year
(Rivera Farm Help)
1968
$ 3,573
1969
5,298
1970
10,303
*192 During 1969 and 1970 petitioner operated a restaurant in addition to his Rivera Farm Help business. The gross receipts and expenses from the restaurant were set forth on separate Schedule C forms. [4] The preparer determined the income and expenses of the restaurant from cash tapes and cash receipts for payments made in cash given her by petitioner. Check stubs were not used to compute the deductible expenses of the restaurant. Petitioner's total adjusted gross income (and selfemployment income for purposes of the self-employment tax) as reported on his returns was $3,573 in 1968, $2,652 in 1969 and $5,764 in 1970. Prior to 1968, petitioner's tax returns were prepared by a different income tax preparer who is now deceased. At the time petitioner switched to the preparer who completed his 1968, 1969, and 1970 returns, he told her that his previousl preparer had computed gross receipts of Rivera Farm Help by talking gross payroll and adding a percentage commission. When the preparer asked petitioner to supply bank ledger sheets or other bank deposit records *193 to assist her in the preparation of the 1968 return, petitioner responded that she would not need the bank records since gross income could be reconstructed from the wage payments appearing in the check stubs plus a 15 percent commission. Petitioner at times appeared to be irresponsible and lax in his business dealings. For example, he was sometimes late in paying his payroll tax and he ignored late notices. Petitioner's bills to customers occasionally were inaccurate, resulting in overcharges and undercharges, and there were times when petitioner failed to appear on the job or when he performed certain jobs late.On occasion, petitioner drank to excess. However, at least one farmer who used petitioner's services for several years was of the opinion that the services of Rivera Far Help were satisfactory and that he could not have expected another labor contractor in the area to have performed the work any better than petitioner. The Commissioner mailed a notice of deficiency to petitioners on March 19, 1976, in which he employed the bank deposits method of proof to reconstruct the gross and net income of Rivera Farm Help for the years 1968, 1969 and 1970. The Commissioner determined *194 that petitioner had underreported the gross and net income of Rivera Farm Help as follows: 1968
1969
1970
Corrected Gross Income
(Rivera Farm Help)
$167,372.63
$282,507.51
$254,656.61
Less: [Gross] Profit
Reported [5]
126,138.00
208,478.00
192,118.00
Unreported Net Profit
(Rivera Farm Help) [6]
$ 41,234.63
$ 74,029.51
$ 62,538.61
As a result of the above adjustments, the Commissioner further determined that petitioner was subject to the selfemployment tax based on the largest amount of earnings subject to tax ($7,800) for each of the years 1968, 1969, and 1970. Finally, the Commissioner determined that all or part of the underpayment of tax for the years 1968, 1969 and 1970 was due to fraud, and he asserted the addition to tax for fraud provided by section 6653(b), I.R.C. 1954, for each year. [7]
*195 The parties have stipulated that petitioner's total correct gross profit from Rivera Farm Help pursuant to the bank deposit analysis method of proof was $167,372.63 in 1968, $282,507.51 in 1969, and $254,656.61 in 1970. The stipulated gross profit figures are identical to those determined by the Commissioner in the notice of deficiency. And petitioners admit in their opening brief that these amounts represent "[the] actual gross receipts received by Rivera from the farm labor business". The stipulation thus establishes that petitioner's Schedule C forms underreported the gross income of Rivera Farm Help as follows: Unreported Gross Income
Year
(Rivera Farm Help)
1968
$41,234.63
1969
74,029.51
1970
62,538.61
These amounts of unreported gross income are equal to the amounts of unreported net income determined in the deficiency notice. Petitioners concede on brief that they omitted from their joint income tax returns more than 25 percent of the gross income stated in the returns for each of the years 1969 and 1970. Petitioner Felipe Rivera did not attend the trial of this case or testify in his own behalf. At the call of the calendar on February 20, 1979, the *196 trial of this case was set for February 28, 1979. When the case was called for trial on February 28, 1979, petitioner failed to appear, and his counsel adivsed the Court that he had last spoken to petitioner on February 16, 1979, that he had tried unsuccessfully to reach petitioner at his home on February 17 and on other occasions when he phoned petitioner's home and talked to petitioner's wife, son, and daughter. Such additional calls were made on February 20, 22, 23, 24, 26, and 27. Petitioner's counsel urged his family to have petitioner "contact" his as soon as possible on each of these occasions, and petitioner's counsel left word on at least one such occasion as to the date of the trial. Petitioner's counsel had nevertheless not heard from him up to the time of trial. Neither the petitioner's opening nor closing brief (filed on petitioner's behalf on May 1, 1979, and May 29, 1979) offered any explanation, apart from pure speculation, as to the reason for petitioner's failure to appear at the trial. OPINION 1. Basic Deficiencies in Tax. The parties have stipulated the amounts of correct gross income of Rivera Farm Help pursuant to the bank deposits method of analysis *197 for the years 1968, 1969, and 1970, and petitioners admit on brief that the "actual gross receipts" were specified amounts that were precisely equal to the foregoing stipulated amounts, which in turn were precisely equal to the amounts of corrected gross income determined by the Commissioner in his notice of deficiency. It is thus undisputed that the actual gross income exceeded the reported gross income by $41,234.63 for 1968, $74,029.51 for 1969, and $62,538.61 for 1970. The Commissioner increased petitioners' net income by these amounts. Petitioners contend that their net income is substantially less than that determined by the Commissioner because they are entitled to additional deductions not claimed on their returns that would partially offset the unreported gross income. Petitioners bear the burden of proving that the Commissioner's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). We hold that petitioners have not met their burden. Petitioners' argument is premised on the fact that in many cases Rivera Farm Help billed the farmers on the basis of a "specified price" or piece-rate, *198 plus a percentage commission. Petitioners assume that the entire amount of the "specified price" or piece-rate component of the bill for each job was paid out as wages to the farm workers, and that petitioner's net income from a job could not exceed the percentage commission component of the bill for that job. They further assume that petitioner must have incurred wage expenses (probably in cash and probably in respect of illegal aliens employed as farm workers) that were not reflected in the check stubs and therefore not claimed as deductions, as well as additional unclaimed non-wage business expenses for items such as payroll tax and unemployment compensation insurance.Petitioners do not deny that there was in fact unreported net income, but they contend that the amount thereof was substantially less than the amount of unreported gross income. That contention isbased on the unproven assumption that petitioner had failed to take deductions on his returns not only in respect of the wages allegedly paid to employees who were responsible for generating the unreported gross income but also in respect of payroll taxes, workmen's compensation, and other business expenses relating to *199 such wages. Moreover, they argue that the "maximum" amount of unreported net income can be determined by subtracting from the unreported gross income such unclaimed wage expenses (computed algebraically by equating the unreported gross income to the unclaimed wage expenses plus the appropriate percentage commission charged for each year), and that the actual amount of unreported net income is that "maximum" amount minus the other non-wage business expenses applicable to such wages. Thus, the linchpin of petitioners' argument is that additional, unclaimed wage and non-wage business expenses were in fact incurred in respect of the unreported gross income, and that these unclaimed expenses should be allowed as offsetting deductions. We find no credible evidence in the record, however, that would justify allowance of any deductions in excess of those claimed on petitioner's return. There is no evidence whatsoever concerning the nature or amount of business expenses for items other than wages that may have been paid but not deducted by petitioners. The return preparer determined the deductions of Rivera Farm Help by reference to amounts appearing in the check stubs given to the return *200 preparer. There is no suggestion of any such business expenditures paid in cash that would not have appeared in the check stubs. We find that petitioners failed to carry their burden of proving that Rivera Farm Help incurred unclaimed business expenses for items other than wages. [8] Moreover, the evidence shows that petitioner's check stubs reflected payments of payroll taxes, workmen's compensation insurance, and the like, all of which were deducted on the returns. The inference is irresistible that if there were any additional payments for such purposes they would similarly have been made by check. Accordingly, in view of the showing in this record that deductions had been claimed for all the payments made by check, we can and do hereby make an affirmative finding that there were no additional unclaimed deductions in respect of payroll taxes, workmen's compensation, and other like non-wage business expenses. *201 Petitioners also have failed to carry their burden of proof in respect of the alleged additional wage payments. The record suggests that there were some illegal aliens working as farm laborers in the Guadalupe-Santa Maria area. Petitioners' bookkeeperreturn preparer speculated that it was possible that some of them may have been employed by Rivera Farm Help and were paid cash wages that were not reflected in the check stubs, but she admitted that she had no personal knowledge of petitioner ever having paid cash wages to any farm workers. None of the other witnesses who testified had any personal knowledge concerning the alleged cash wage payments. Furthermore, contrary to petitioner's theory, there is no satisfactory proof that petitioner paid his workers the entire amount of the piece-rate component of his gross receipts when he charged the farmers a "specified price" or piece-rate plus a percentage commission. [9] The witnesses were not familiar with how petitioner paid his laborers, nor did they know of any customary method employed by the labor contractors in the Guadalupe area to compensate their workers. The evidence falls far short of proving that petitioner's business *202 practices were such that it is likely that he paid wages in amounts greater than those deducted in the returns. Finally, we think petitioner's failure to apear at trial or to testify raises an inference that his testimony would not have been helpful to his claim of additional deductions for wage payments. We hold that petitioners have failed to prove their entitlement to additional deductions for wages or other unclaimed business expenses. Accordingly, we sustain the Commissioner's determination of the deficiencies for the years 1968, 1969 and 1970. [10]
2. Additions to Tax for Fraud. The Commissioner determine d that all or a part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade *203 tax on the part of petitioner Felipe Rivera. The Commissioner has the burden of proving, by clear and convicing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a), I.R.C. 1954; Rule 142(b), Tax Court Rules of Practice and Procedure; Lollis v. Commissioner, 595 F. 2d 1189 (9th Cir., 1979), affg. a Memorandum Opinion of this Court; Baumgardner v. Commissioner,251 F. 2d 311, 322 (9th Cir. 1957), affirming a Memorandum Opinion of this Court. To establish fraud, the Commissioner must show that the petitioner intended to evade taxes which he knew or blieved to be owing. Stoltzfus v. United States, 398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Powell v. Granquist, 252 F. 2d 56, 60 (9th Cir. 1958). The Commissioner need not prove the precise amount of the underpayment resulting from fraud, but only that some portion of the underpayment is attributable thereto. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner, 328 F. 2d 147, 150 (7th Cir. 1964), *204 affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, supra, 53 T.C. at 105-106.Since fraud can seldom be established by direct proof of intention, a finding of fraud may be based upon circumstantial evidence and reasonable inferences drawn from the evidence. See, e.g., Powell v. Granquist, supra, 252 F. 2d at 61; Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, supra, 53 T.C. at 106. Fraud may be inferred from "any conduct, the likely effect of which would be to mislead or conceal." Spies v. United States, 317 U.S. 492, 499 (1943). Based on the entire record, we hold that the Commissioner has carried his burden of proving fraud for each of the years at issue. The correct gross income of Rivera Farm Help ($167,372.63 in 1968, $282,507.51 in 1969, and $254,656.61 in 1970), as stipulated, exceeded the reported gross income from that source for the years 1968-1970 by 32.7 percent, and 32.6 percent, respectively. And if the unreported gross income must be treated in this case as unreported net income for purposes *205 of fraud, as will hereinafter be shown, the correct net income of Rivera Farm Help exceeded the reported net income from that source ($3,573 for 1968, $5,298 for 1969, and $10,303 for 1970) by 1,154.1 percent for 1968, by 1,397.3 percent for 1969, and by 607 percent for 1970. Petitioner relies on the existence of unclaimed deductions to vitiate this pattern of underreported income. However, if the Commissioner proves that petitioner underreported his gross income and he allows all claimed deductions, and if petitioner fails to come forward with at least some probative evidence of additional deductions, it has become firmly established that he is not entitld to the benefit of any such additional deductions, even in criminal fraud cases where the Government bears the greater burden of proof beyond a reasonable doubt. Thus, in United States v. Vender, 218 F. 2d 869 (7th Cir. 1955), cert. denied 349 U.S. 920 (1955), it was stated (218 F. 2d at pp. 871-872): If the defendant had additional costs or expenses that offset the unreported income established by the Government's case, the burden was on him to prove that as part of his defense. *206 In his brief on appeal the defendant insists that this rule of law improperly shifts part of the burden of proof from the Government to him. But as we have pointed out, the Government satisfies its burden of proof when it shows that the taxpayer has received more income than was reported. It is then the taxpayer's burden to show, if he can, that, even though he received more income than he reported, he does not owe any additional tax. This rule is grounded on the realization that it would be virtually impossible for the Government to show the negative fact that a taxpayer had no unreported deductions of exclusions. In such a case the Government, having shown unreported income, is aided by the presumption that the deductions and exclusions listed by a taxpayer in his return are all that exist. This presumption is based upon reasonable experience (taxpayers would not knowingly fail to report all valid deductions), and has the effect of shifting the burden of going forward with the evidence to the defendant, when the Government has shown unreported income. (Citations omitted.) To the same effect, see Elwert v. United States, 231 F. 2d 928, 933 (9th Cir. 1956); *207 Beck v. United States, 298 F. 2d 622, 632-633 (9th Cir. 1962), cert. denied 370 U.S. 919 (1962); United States v. Stayback, 212 F. 2d 313, 316-317 (3d Cir. 1954), cert. denied, 348 U.S. 911 (1955); Clark v. United States, 211 F. 2d 100, 102-104 (8th Cir. 1954), cert. denied 348 U.S. 911 (1955); United States v. Link, 202 F. 2d 592, 593-594 (3d Cir. 1953; United States v. Hornstein, 176 F. 2d 217, 220 (7th Cir. 1949); Smith v. Commissioner, 35 T.C.M. 512, 518, 45 P-H Memo. T.C. par. 76,114 (1976). To be sure, there may be exceptional situations where there is a solid basis for the assumption that the taxpayer had unclaimed deductions that could have nullified the unreported gross income, and in such circumstances the burden of disproving the existence of the deductions in question has been held to rest upon the Government. See Richardson v. Commissioner, 264 F. 2d 400, 404-405 (4th Cir. 1959); [11]Perez v. Commissioner, 33 T.C.M. 946, 952, 43 P-H Memo. T.C. par. 74,211 (1974). However, no such exceptional situation *208 is present here. Petitioners presented no such probative evidence as is called for by the Bender line of cases that would place the burden upon the Government in respect of any alleged unclaimed deductions. The evidence which was offered on his behalf was purely conjectural. Indeed, all that we have before us is merely teasing speculation that petitioner may have employed illegal aliens and that he may have paid their wages to them in cash, for which he had failed to claim deductions on his returns. Such evidence is far too thin to avoid the application of the rule in Bender and related cases. And, as previously pointed out, pettioner did not appear at the trial to explain his omissions from gross income or to support his claim for additional deductions with his own testimony. Cf. Cohen v. Commissioner, 9 T.C. 1156, 1164 (1947), affd. 176 F. 2d 394 (10th Cir. 1949). [12]
*209 Moreover, wholly apart from the alleged cash wages to illegal aliens, we have made an affirmative finding on the evidence that petitioner had no unclaimed deductions for payment of payroll taxes, workmen's compensation, and the like in respect of the alleged cash wages. Accordingly, contrary to petitioner's position, his unreported gross income could not have been offset to any extent by any such unclaimed non-wage business expenses as contended on his behalf. Also, even if he had paid cash wages as suggested, the record establishes beyond doubt that there was a gap between the rate of his retained commissions (16 and 18 percent) and the rate of commissions (15 percent) which he instructed his tax preparer to use in computing his reportable income. To the extentof any such gap, at the very least, there could not have been any unclaimed deductions that would, on any theory, offset petitioner's unreported gross income. Thus, even if petitioner had attempted to satisfy the requirements of the Bender line of cases with evidence that he had in fact made deductible cash payments of wages that were not reflected on his returns, there would still remain comparatively substantial *210 amounts of unreported taxable net income. Assuming arguendo that petitioner had unclaimed deductions for cash wages in the amounts set forth in his brief, by his own calculations he would have had unreported net income in the amounts of $6,185.20 in 1968, $13,588 in 1969, and $15,227.90 in 1970. [13] These repeated and unexplained omissions, substantial in comparison to the corresponding amounts of net income reported in the returns, are persuasive evidence that a part of the underpayments in tax for each of the years 1968 through 1970 was due to fraud. A pattern of consistent and substantial understatements of income is itself evidence of fraud standing alone. See, e.g., Baumgardner v. Commissioner, 251 F. 2d 311, 322 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Lollis v. Commissioner, 595 F. 2d 1189 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. *211 We are fully aware of the general principle that we cannot find fraud simply on the basis of petitioner's failure to meet his burden of proving error in the determination of the deficiencies. See, e.g., Estateof Beck v. Commissioner, 56 T.C. 297, 363 (1971). Howver, our finding of fraud is not based on any such failure of proof, [14] nor is it based solely on his failure to report substantial income, because there are other significant indicia of fraud. *212 The evidence is clear that petitioner misled his return preparer concerning the proper method of calculating his gross receipts from Rivera Farm Help. First, he instructed her to compute gross receipts on the basis of payroll disclosed in the check stubs plus a fixed percentage commission. This "accounting" method bore no relationship to petitioner's actual billing practices in the number of instances where petitioner's charge was based on a flat rate per pound or acre without a percentage commission. Furthermore, in cases where a percentage commission was charged, the accounting method would not be accurage unless the amount of wages actually paid to the workers was equal to the "specified rice" component of the bill for the job. There was no satisfactory evidence that the workers were in fact paid the full amount of the specified price or piece-rate componant of the bill. Second, petitioner told the preparer to use a 15 percent commission rate in each of the years at issue. [15] However, petitioner's true commission rate was 16 percent in 1968, and 1969, and 18 percent (in a relatively few cases, 16 percent) in 1970. The result of empoying petitioner's method of calculation *213 together with the 15 percent commission rate was a consistent understatement of gross income of such character that we cannot believe petitioner's instructions to his return preparer to have been the product of mere inadvertance or negligence. Petitioner must have been aware that his actual commission rate was greater than the rate he told the preparer to use, and that he often did not base his charges on a specified price plus a percentage commission. And, unlike petitioner's inaccurate methods of computing his bills to the farmers, which sometimes contained undercharges or overcharges, the accounting method employed for tax purposes consistently understated income. [16]
*214 Petitioner's failure to supply bank records or bank ledger sheets to his return preparer in response to her specific request is another indication of fraud. Petitioner told the preparer that she would not need the bank records is she used the previously described accounting method. The bank recoreds would have revcealed that petitioner's accounting method substantially understated gross income. In fact, the stipulated correct gross income of Rivera Farm Help was determined pursuant to the bank deposits method of analysis. The evidence of fraud in this case stands largely uncontradicted because of petitioner's failure to appear and testify at trial. We are satisfied that the Commissioner has shown by clear and convincing evidence that a part of the underpayment in tax for each of the years at issue was due to fraud on the part of petitioner Felipe Rivera, and petitioner's failure to appear certainly cannot deprive that evidence of the weight which should otherwise be accorded to it. 3. Statute of Limitations. Petitioners admit on brief that "it appears that the unreported gross income exceeds 25% of the reported income in each of the three years in question." Accordingly, *215 since there is no dispute that the notice of deficiency was mailed on March 19, 1976, less than six years from the due dates of the 1969 and 1970 returns (April 15, 1970 and 1971), petitioners do not contest the timeliness of the notice as to 1969 and 1970. Section 6501(e)(1)(A), I.R.C. 1954. And our finding of fraud as to all three years disposes of petitioner's contention that the statute of limitations bars the assessment and collection of the deficiencies and additions to tax even as to 1968. Section 6501(c)(1), I.R.C. 1954. Decision will be entered for the respondent. Footnotes
1. The stipulation of facts refers to four exhibits, A through D. However, upon offering the stipulation at the trial, respondent's counsel referred without objection only to Exhibits A through C. Moreover, no Exhibit D was ever submitted, even though it is described in paragraph 23 of the stipulation and is stated to be attached. During the course of the trial a document tendered to the clerk for identification and not offered in evidence was designated Exhibit D, but it appeared to be entirely different from the Exhibit D that was described in paragraph 23 of the stipulation.↩
2. The return preparer erroneously used a 15.5 percent commission rate for 1970. Petitioner had instructed her to use a 15 percent rate. ↩
3. The gross receipts figures reported on the returns for 1968, 1969, and 1970 were rounded to the next lowest dollar.↩
4. The Commissioner does not challenge the correctness of the 1969 and 1970 Schedule C forms for the restaurant.↩
5. In an apparent typographical error, the notice of deficiency refers to these amounts, which correspond to the gross income reported on the Schedule C forms for Rivera Farm Help, as "Net Profit Reported". ↩
6. The Commissioner allowed all of the deductions claimed on the 1968, 1969, and 1970 Schedule C forms for Rivera Farm Help.↩
7. The Commissioner concedes on brief that petitioner Cecilia R. Rivera is not liable for any of the section 6653(b)↩ additions to tax for the years at issue.
8. In their opening and reply briefs petitioners candidly admit that it is "likely" that they did not meet their burden of proof in respect of these additional deductions inasmuch as petitioner Felipe Rivera failed to appear at trial and present evidence in support of the deductions.↩
9. Also, the record is silent as to what portion of the billings in fact was paid to the laborers in those cases where petitioner's charge to the farmers did not include a separately stated percentage commission. ↩
10. Petitioners make no argument concerning the Commissioner's determination of unreported self-employment income for the years at issue. We conclude that they have abandoned their opposition to the self-employment tax adjustments.↩
11. In Richardson,↩ it was clearly established that there were substantial amounts of unclaimed deductions, and the only question in respect thereof was whether they were of sufficient magnitude to offset the unreported income. 12. It is important to note that petitioner kept receipts for cash expenses incurred in his restaurant business during 1969 and 1970 which he provided to the income tax preparer to enable her to compile his returns. In respect of Rivera Farm Help, however, petitioner supplies no receipts or other corroborative evidence of cash expenditures to his preparer or to this Court. His practice of keeping receipts for the restaurant, while allegedly having none for Rivera Farm Help, raises substantial doubt whether there were in fact any unclaimed cash expenditures for the latter business.↩
13. These figures appear at p. 9 of petitioner's opening brief. While it is true that they are there described as "maximum" unreported net income for the years in issue, the only ground for treating them as "maximum" is that they are based on wages paid and thus to not take into account any additional non-wage cash expenses. However, not only does the brief admit that "it is likely that petitioners failed to sustain their burden of proof on any extra expenses" (pp. 9-10), but we have found affirmatively on the vidence that no such additional non-wage cash expenses were in fact incurred. Accordingly, what the brief has described as "maximum" unreported net income should more appropriately be characterized as "minimum" unreported net income.↩
14. We refer here, of course, to our conclusion in the first part of this opinion that petitioners have failed to carry their burden of proof in respect of the basic deficiencies. However, to the extent that the Government has the burden of proof to establish fraud, Bender↩ and related cases make clear that the Government has made out a prima facie case towards satisfying its burden of proving that there was unreported taxable income when it establishes that there was unreported gross income and where petitioner has failed to come forward with evidence that there were offsetting unclaimed deductions. This latter "burden" on the part of the taxpayer is to be sharply distinguished from his general burden of proof to show error in the Commissioner's determination of the basic deficiency.
15. The preparer erroneously used a 15.5 percent rate in computing gross receipts for 1970. ↩
16. On brief petitioner attempts to explain his accounting method by suggesting that it was devised by a previous return preparer, now deceased.This suggestion is not supported by the record. The record shows at most that some such method was used by the deceased return preparer, but it fails to show whether that method was devised by the preparer or whether he used it on petitioner's instructions. In any event, there is no reason to conclude that the accounting method was substantially accurate for years prior to 1968, or that petitioner believed it to be accurate during the years at issue.↩